**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

HARRY S. STONEHILL, the Estate of;
ROBERT P. BROOKS, the Estate of,
           *Defendants-Appellants.*

No. 10-35789

D.C. No.
3:65-cv-00127-PA

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior District Judge, Presiding

Argued and Submitted
March 18, 2011—San Francisco, California

Filed September 28, 2011

Before: Alex Kozinski, Chief Judge, Thomas M. Reavley,*
and William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

---

*The Honorable Thomas M. Reavley, Senior Circuit Judge for the Fifth
Circuit, sitting by designation.

## COUNSEL

Randolph Lyons Hutter, Frank Phillip Cihlar, Charles Duffy, Bethany B. Hauser, U.S. DEPARTMENT OF JUSTICE, TAX DIVISION, Washington, D.C., for the appellee.

Robert Eldon Heggestad, Jonathan Cohen, John Richard Gerstein, TROUTMAN SANDERS, LLP, Washington, D.C., Paul L. Gale, TROUTMAN SANDERS, LLP, Irvine, California, for the appellants.

## OPINION

W. FLETCHER, Circuit Judge:

Harry Stonehill and Robert Brooks ("Taxpayers") appeal the district court's denial of their Rule 60(b) motion to vacate a 1967 tax judgment against them. Based on evidence discovered through the Freedom of Information Act ("FOIA"), Taxpayers argue that the government committed fraud on the

court during their 1967 suppression hearing, *United States v. Stonehill*, 274 F. Supp. 420 (S.D. Cal. 1967) ("*Stonehill I*"), and their subsequent appeal to this court, *United States v. Stonehill*, 405 F.2d 738 (9th Cir. 1968) ("*Stonehill II*"). We conclude that, although the evidence uncovered by Taxpayers shows some misconduct on the part of the government, it is insufficient to demonstrate fraud on the court. Taxpayers also argue that the judgment should be vacated under *United States v. Throckmorton*, 98 U.S. 61 (1878), because William Saunders, Taxpayers' business associate who sometimes served as their attorney, gave information to the government. Because Taxpayers have not shown Saunders was their attorney rather than their business associate at the time he informed on Taxpayers, we reject Taxpayers' *Throckmorton* claim.

As will become apparent during the course of this opinion, this litigation has been extraordinarily protracted. We have written an unusually detailed opinion in the hope that we may thereby finally lay this litigation to rest. For the reasons that follow, we affirm the district court.

## I.    Background

We begin with a general overview of the facts and procedural history. We then discuss in more detail the evidence uncovered at each stage of the litigation.

## A.    General Overview

Harry Stonehill was stationed in the Philippines during World War II. During and shortly after the war, Stonehill made tens of thousands of dollars buying and reselling army surplus cars, and importing Christmas cards from the United States. After the war, Stonehill briefly returned to his native Chicago, but returned to the Philippines several years later. Upon his return, Stonehill began what became an enormously

successful business career, eventually becoming Robert Brooks's partner.

The Philippines became independent on July 4, 1946. The early years of Philippine independence were notable for their tumultuous politics and extensive corruption. Taxpayers began their business ventures during these years. Taxpayers eventually owned sixteen different corporations in the Philippines, the most prominent of which was the United States Tobacco Company ("U.S. Tobacco"). U.S. Tobacco was the first company to produce American-style cigarettes in the Philippines. U.S. Tobacco's success was aided by the Philippine government's drastic limitation of the importation of American cigarettes in 1949. Stonehill, not surprisingly, supported (and, according to some, purchased) this limitation. U.S. Tobacco, as well as Taxpayers' many other business ventures, were extremely successful, and Taxpayers became wealthy and influential figures in the Philippines.

Taxpayers' success attracted attention from both Philippine and U.S. authorities. The U.S. State Department became interested in Stonehill's operations as early as 1950. The State Department requested that the U.S. Embassy in Manila conduct a "discreet investigation" into Stonehill's operations. In its report to the State Department, the Embassy observed that Stonehill's businesses were conducted "just within or just beyond the limits imposed by law," and that Stonehill "has the reputation of not paying his full income tax." Over the next decade, U.S. authorities became convinced that Stonehill did not pay income taxes he owed to the United States. In 1960, the IRS sent Stonehill's 1958 tax return for audit to Robert Chandler, the IRS representative to the Far East stationed in Manila. However, Chandler took no action because he had insufficient resources to conduct an extensive investigation.

Philippine attention to Taxpayers began in the late 1950s. It intensified after the election of President Diosdado Macapa-

gal in 1961. Macapagal was elected on a reformist, anti-corruption platform. Although, as we discuss below, Macapagal and his party were not free from corruption themselves (including corruption involving Stonehill), Macapagal focused, at least rhetorically, on rooting out the influence of corrupt foreign businessmen. During this period, the Philippine government conducted wiretaps of Taxpayers' activities.

In late 1961, Menhart Spielman contacted Robert Hawley, an FBI agent stationed as the Legal Attache in Manila. Spielman had been the Executive Vice President of U.S. Tobacco, but had recently resigned from that position after a violent altercation with Taxpayers. Spielman told Hawley that he had confronted Taxpayers about massive illegalities in U.S. Tobacco. It is equally or more likely, however, that Spielman had attempted to blackmail Taxpayers by threatening to go to the authorities if they did not give him an ownership share in the company. Either way, Taxpayers responded by beating Spielman unconscious, resulting in his hospitalization.

Spielman told Hawley that he could give the FBI information concerning illegal activity at U.S. Tobacco. Hawley concluded that, to the extent Spielman's information suggested violations of U.S. law, it was U.S. tax law. Hawley therefore asked if Spielman would speak to IRS Agent Chandler. Spielman agreed to do so. Although Spielman's information suggested violations of U.S. tax law, it primarily suggested violations of Philippine law. Chandler and Hawley therefore told Spielman that he should talk to the Philippine National Bureau of Investigation ("NBI"), the Philippine equivalent of the FBI. Spielman was reluctant to do so for fear that the NBI was in league with Taxpayers. Spielman said that if Taxpayers found out he was talking to the authorities, they would kill him.

Hawley and Chandler eventually convinced Spielman to talk to Colonel Jose Lukban, the Director of the NBI. In a series of discussions at Chandler's house, Spielman gave Luk-

ban significant information about where Taxpayers kept records and illegally imported material for making cigarettes that would demonstrate various violations of Philippine law. Some of these meetings were attended by Philippine Secretary of Justice Jose Diokno. The information provided by Spielman eventually led to a massive NBI raid on all of Taxpayers' businesses on March 3, 1962. Approximately two hundred NBI agents raided approximately seventeen different corporations.

After the raid, the NBI made many of the seized documents available to U.S. officials. The extent of U.S. access to the documents is contested, and we discuss the evidence concerning U.S. access in detail below. The documents to which U.S. officials had access were analyzed by Chandler, with William Ragland, an IRS Agent, and Sterling Powers, an IRS Assistant Revenue Service Representative. Ragland and Powers had been sent to Manila shortly before the NBI raid specifically to aid Chandler in the Stonehill investigation.

On April 22, 1962, Menhart Spielman disappeared. Spielman had apparently been dissatisfied with his treatment by the NBI and had approached Stonehill's lawyers in search of some sort of deal. Spielman then attempted to flee the Philippines, assisted by men associated with Stonehill. Philippine authorities eventually obtained confessions from the crewmen of a boat called the "Kingdom." The crewmen claimed they attacked Spielman on the boat while he was asleep and threw him semi-conscious into the shark-infested waters of the Sulu Sea. The U.S. government was somewhat skeptical of this story. It is, however, certain that Spielman disappeared.

Philippine enforcement proceedings against Taxpayers were complicated by Philippine politics, by a Philippine Supreme Court decision that the March 3 raid violated the Philippine Constitution's equivalent of the Fourth Amendment, and by the disappearance of Spielman, their primary witness. After negotiations with Philippine authorities, Tax-

payers agreed to leave the country voluntarily in exchange for the government's agreement not to pursue criminal charges. Taxpayers left the Philippines on August 4, 1962.

The documents seized in the March 3 raid were sufficient, even without testimony from Spielman, to trigger a series of legal actions in U.S. courts against Taxpayers, as well as against Ira Blaustein, Taxpayers' New York agent. The United States filed a civil tax case against Taxpayers in January 1965 in the District Court for the Southern District of California. The government sought federal tax liens securing federal income tax liabilities outstanding against Taxpayers for the years 1958 through 1961. Taxpayers moved to suppress the documents seized in the NBI raid. The proceedings in that motion form the basis of the present dispute.

### B.    Suppression Proceedings and Opinions

At the time the U.S. government filed this case against Taxpayers, the Philippine Supreme Court had already held that the raid violated the Philippine Constitution's version of the Fourth Amendment. *Stonehill I*, 274 F. Supp. at 423-24. The United States did not contend that the NBI's search warrants were lawful under either Philippine or U.S. law, but argued that under the "silver platter" doctrine the evidence should not be suppressed because United States agents did not instigate or participate in the raid. *See id.* at 426 (documents seized in violation of the Fourth Amendment should not be suppressed "if the illegal search and seizure is made by foreign government officers").

The major issue in the suppression motion in the district court was the extent of U.S. participation in the planning and execution of the raid. *See id.* at 424-25. Taxpayers argued that United States agents, primarily Chandler and Hawley, had sufficiently participated in the planning and execution of the raid to make the "silver platter" doctrine inapplicable.

Taxpayers filed their motion to suppress on March 13, 1967. The hearing on the motion to suppress was held between June 12 and June 23, 1967. Nine witnesses provided live testimony, and testimony was read from numerous depositions. The transcript from the hearing totaled 1,257 pages.

Much of the evidence at the suppression hearing came from Hawley's and Chandler's testimony. The district court denied Taxpayers' motion to review all government memoranda concerning the raid, granting them access only to "all documents which were made from records seized in the Philippines." However, the government did introduce some internal documents and cables dealing with preparations for the raid, as well as summaries of other documents and cables. It is unclear from the current record exactly what the government disclosed, but it was likely a small percentage of what is now available. Included in the documentary evidence introduced by Taxpayers were two pages of paper containing notes about sites that the NBI should raid. Some of the notes were in Chandler's handwriting. These pages were part of a set of photographs, maps, and notes of raid sites. These pages were not provided by the United States but, rather, had been leaked to Taxpayers by someone in the NBI. We refer to these documents as the Picture Folder, which we discuss in detail below.

We begin by describing the most important testimony by Hawley and Chandler. We then describe the district court's findings concerning the history of U.S. involvement in the raid, and our conclusions on appeal in 1968. We then describe Taxpayers' subsequent motions to suppress.

### 1.    Hawley's Testimony

Hawley's testimony was introduced through his deposition, which had been taken on January 17, 18, and 31, 1967. The parties have introduced relatively small selections of Hawley's deposition into the record before us in the current proceeding. We describe those selections, and fill in some details

based on descriptions in the district court's 1967 opinion and our 1968 opinion.

Hawley served as Legal Attache at the American Embassy in the Philippines starting in August 1961. Spielman met with Hawley alone on December 14, 15, and 16, 1961. Most of the information Spielman gave to Hawley concerned violations of Philippine law. Hawley testified, however, that some of Spielman's evidence suggested violations of U.S. law. For example, Spielman told Hawley that Stonehill, together with his agent Ira Blaustein in New York, had mislabeled a machine used to slit cigarette paper in order to pay the lower Philippine import duty for agricultural machinery. Such mislabeling would have constituted a violation of the U.S. Bill of Lading Act. Hawley reported this potential violation to Washington.

Hawley testified that he concluded that the majority of potential violations of U.S. law were tax law violations. Hawley therefore suggested that Spielman meet Chandler. *See Stonehill I*, 274 F. Supp. at 421. Hawley and Chandler together met Spielman on December 18, 20, and 23, 1961. Chandler and Hawley eventually convinced Spielman to talk to Philippine authorities. *Stonehill II*, 5405 F.2d at 741. The first such meeting occurred on January 27, 1962. Present at the meeting were Lukban, Damaso Nocon (Lukban's right-hand man), Spielman, Chandler, and Hawley. We describe these meetings in detail in discussing Chandler's testimony.

Hawley testified that during the period before the raid, Lukban provided him with copies of wiretaps the NBI had placed on Taxpayers. Hawley testified that he had not asked for these transcripts and that he stopped receiving wiretap transcripts after the raid. He also testified that he showed Chandler some of the wiretaps and technical surveillance reports that Lukban had made available to him.

Hawley testified that at some time prior to February 24, 1962, the date the raid was originally scheduled, Secretary

Diokno had casually mentioned to him that the raid had been planned. Hawley testified that he had no specific knowledge concerning what was going to be raided, and that Diokno had not asked him for his recommendations as to locations that the NBI should raid. He also testified that he did not ask Diokno to provide him with any information that the NBI recovered in the raid.

The raid was postponed. Hawley testified that he had not been told of the postponement. He "remember[ed] wondering why by the following Monday, I hadn't seen anything in the paper about [the raid]." Further, Hawley testified that he was never told the final date for the raid. He was asked, "On March 3, you didn't know anything about the raids?" He responded, "No." He testified that he had scheduled a party for March 4. Even on the day of the raid he had "no idea of any kind of projected raids or anything." The night of the raid he was home with his wife after spending some time at the office. He testified that he first learned of the raid in the Sunday copy of *The Manila Times* the day after the raid. He had the following exchange with Stonehill's counsel:

> Q   When did you first find out that Stonehill was arrested and that the raids had taken place?

> A   I think it was in the Sunday paper, the Manila Times.

> Q   That was when you found out and that was delivered to you in the morning when you woke up?

> A   Yes.

> Q   At that time, you knew nothing about either the raids or Stonehill's arrest until the time you read it in the Times?

A   No.

Q   What was your reaction?

A   Interested that it had come about.

Q   You knew it was planned, actually? You knew
    it was?

A   Yes, but I had no positive date at all.

Q   You had no positive date?

A   No.

### 2.   Chandler's Testimony

Chandler testified in person at the suppression hearing. He testified that he was assigned to examine Stonehill's 1958 tax return in 1960. He testified that the only time he saw a wiretap transcript was in December 1961, and that Hawley showed it to him. Much of Chandler's testimony included in the record on appeal in 1968 focused on his activity coordinating communications between Spielman and Lukban, and his activity during the days surrounding the raid. Chandler testified that the initial meetings between Lukban and Spielman took place at Chandler's home. Chandler said that Spielman requested that the meetings be there because Spielman "wouldn't go near a Philippine government office at that time." Hawley and Diokno attended the meetings "once or twice." Chandler testified that he did not set the date for the raid, and that he had not been asked to participate in the raid or to assign any agent to the raid. He was told the date of the raid would be February 24 by someone in the NBI, probably Nocon.

During cross-examination, Chandler was asked a series of questions about whether he saw any pictures of potential raid

sites. At this point in the hearing neither Chandler nor the government knew that the defense had part of the Picture Folder. Chandler first testified that he had never himself taken or had others take any pictures of the buildings to be raided. Chandler and Taxpayers' attorney then had the following exchange:

> Q. Mr. Chandler, did you ever see any pictures of any of the locations at which the raids were to be made?

> A. I don't remember. I had — it seems to me that I had heard the NBI had photographed some of the — had made some photographs. I don't recall whether I ever saw them.

> Q. Isn't it a fact, Mr. Chandler, that the NBI made picture folders of each of the locations to be made, and showed them to you?

> A. I don't recall seeing pictures, no.

> Q. But you do have some recollection of the NBI taking pictures?

> A. Yes, I have a recollection that they did do —

> Q. Did you recollect that you were told that by Mr. Danny Nocon?

> A. I think probably Danny, yes.

They continued on the same subject shortly thereafter:

> Q. Do you recall seeing some files or documents which were called picture folders on March 2?

> A. I don't recall seeing pictures, and yet I may have.

Q.   But you are clear —

A.   I may have seen these pictures at some time . . . [b]ut I wouldn't recall if it was March 2nd.

Q.   But you are clear that any pictures you saw would have been made by the NBI?

A.   Oh, yes.

Taxpayers' attorney then asked Chandler if he had ever made a sketch of several of the buildings to be raided and had given that sketch to Nocon or another NBI agent. Chandler said he may have helped Spielman make a sketch, but he would not have made one on his own. If there were such a sketch, he would have given it to Spielman, not directly to the NBI.

Taxpayers then introduced the parts of the Picture Folder in their possession. This consisted of two pages. The first page was divided into three parts. The bottom two parts each contained a sketched floor plan of a building. There were five circled numbers identifying various locations within the two buildings. The top part of the paper had five instructions, which corresponded to the five circled numbers. Next to number one was written, "Check cigarette case for stamps." Next to number two was written, "Check dummy wall for door." Next to number three was written, "Rolls of paper t/b checked — is it actually cigarette paper for slitting[?]" Next to number four was written, "Check closely all items + area for stamps." Next to number five was written, "Check all packing material for stamps."

The page consisted solely of writing and was titled, "U.S. Tobacco Co. — Picture Folder." It included a list of circled numbers, one through twenty, with comments after the numbers. These comments each seemed to correspond to something different, perhaps to a different picture. For example,

next to number one was written "No comment." Next to number two was written, "Motor Pool, no significance." Next to number four was written, "Goodyear Bldg. — John Brook's — Confiscate records in separate small adjoining bldg. — This is bldg. from which John Brooks carried stamps at night." Next to number nine was written, "Goodrich Bldg. — Chambon Slitting Machine + Evening News Newsprint supply."

Chandler testified that although he had no recollection of preparing these documents, the handwriting on both pieces of paper was his. He testified that the language is "Spielman's language." When asked why he would be preparing such a document for an informer, Chandler responded, "Spielman was an unusual individual. He pestered the life out of you on things and I figured on something of that nature, I don't know what reason he would have given me, why I should write it down rather than he should write it down, because it was his information." The following three exchanges provide a sense of Chandler's testimony during cross-examination concerning the Picture Folders:

> Q. Does this language [instructions to "check" several places from the first piece of paper] recall to you that you did give instructions to the NBI prior to the raids or advice?
>
> A. Well, I did relay some — did help Spielman get some of his information to them, because they didn't understand each other.
>
> Q. And you did this to help with the raiders, is that correct?
>
> A. I presume that would probably be used in the raids, yes.

A second exchange was:

Q. Now, I call your attention that each of these items I read on the first sheet, "Check, check, check, check," and one that says "To be checked," I think that is what it means, are numbered 1, 2, 3, 4, 5, and these numbers are placed in certain areas on these diagrammatic sketches of the buildings. Are these numbers in your handwriting also?

A. Yes, those numbers are in mine.

Q. So, in other words, those numbers were placed on these three sheets by you. Does that refresh your recollection to the effect that you were trying to specify for the NBI exactly where the places were that the agents and team leaders were to go?

A. Well, undoubtedly I was trying to set down Spielman's information.

In the third exchange, the questions are coming from the court:

Q. Now, can you tell me, how did you know that location 1 was a place to be checked for stamps, location 2 was a dummy wall, location 5 was packing material, how did you know all of that?

A. I had listened to Mr. Spielman talk about that for weeks, this type of thing.

Q. And you mean to say you got all your information about this building and these locations from Mr. Spielman?

A. Yes, your Honor.

Q.  You never made any personal investigation of these buildings?

A.  No, your honor. He had told me this many times, he had told the NBI people many times. . . . But it might be exactly an example of what I am speaking of, they did not understand [him], even though he talked with them, just the same as he did with me.

On redirect, Chandler further explained that, although he did not specifically remember making these drawings, he often served as a liaison between Spielman and the NBI. "There was not altogether rapport between [Spielman] and the NBI. I might have helped him to do something. He might have sketched this out and I might have done some of the writing." Chandler testified that he could not have drawn the diagrams without Spielman because he had never been to the buildings they depicted.

Returning to the days surrounding the raid, Chandler testified that late on the night of March 2, the night before the raid, Nocon came to Chandler's house and told him Lukban would like Chandler to come to his house. Chandler testified that he followed Nocon to Lukban's house, where Lukban's associates were preparing search warrants. While there, Chandler asked if they had included the Army and Navy Club as a raid point. Nocon said they had not included the Army and Navy Club, and Chandler persuaded them to do so. Chandler testified that he gave no other advice to Lukban and made no requests of him. Chandler testified that he did not visit the Army and Navy Club that night with an NBI officer, but went straight home from Lukban's house.

Chandler testified that on the day of the raid he, along with William Ragland and Bill Reynolds, IRS agents who had recently arrived in Manila, went to an area across the street from the NBI headquarters that Lukban had designated as the

place they should wait during the raid. That evening, at around 10 p.m., Lukban called them and said that "they had hit the jack pot." He invited them to come to his office in the NBI headquarters. Chandler testified that he saw boxes throughout the headquarters building. While Chandler, Ragland, and Reynolds were with Lukban, an NBI agent reported that they had just seized a tremendous quantity of records and requested help sorting them. Lukban asked if Chandler, Ragland, and Reynolds would help the agent. They followed the agent to a location in the port area. When the three men arrived, they identified the documents they thought were important and placed them in a carton for the NBI to take back to headquarters.

Chandler testified that he had felt that "this business was rather disorganized." Thus, on the way back from the port "out of curiosity I went up to the main office, drove up to the main office of the U.S. Tobacco Corporation, to see whether that was equally disorganized." Ragland and Reynolds remained in the jeep, and Chandler went into the office. Chandler testified that once in the office, he pointed out to NBI agents a back room area that the agents should search. *Stonehill II*, 405 F.2d at 742.

Chandler testified that on the Monday after the raid, March 5, Lukban brought Chandler, Reynolds, and Ragland to the NBI building. Lukban gave them a place to work and made some records available. Once Reynolds and Ragland started work, Chandler left.

### 3.   District Court Opinion

The district court denied Taxpayers' motion to suppress on October 16, 1967. *Stonehill I*, 274 F. Supp. at 420. The district court made the following factual findings. Spielman initially went to Hawley with documents he had obtained from U.S. Tobacco. *Id.* at 421. Hawley and Chandler eventually convinced Spielman to speak with Lukban. *Id.* "For some

time before Colonel Lukban's interview with Mr. Spielman, the [NBI] had been engaged in gathering evidence concerning the activities of Stonehill and Brooks." *Id.* Lukban eventually decided to proceed with the raid, despite the fact that Chandler "negated any procedure which included raiding."[1] *Id.* at 421-22. The NBI then "consummated raid plans," and because "Colonel Lukban and Robert Chandler were friends, some of the [raid planning] meetings were held in the home of Robert Chandler." *Id.* at 422.

The court found that at "one of the various meetings of members of the [NBI] (at which Robert Chandler was also present) the premises to be raided were mentioned, and Robert Chandler inquired whether the Army and Navy Building was included on the list of premises" to be searched. *Id.* Learning that it was not, he suggested that it be included, and it eventually was included. *Id.* "Sometime during the investigation," a diagram of certain of Stonehill's companies "was drawn by Robert Chandler . . . , together with a memorandum. . . . The diagram and memorandum thereafter came into possession of the [NBI]." *Id.*

The court found that during the planning meetings "Lukban had promised Robert Chandler that he, Chandler, would be permitted to examine and copy documents and records which the [NBI] obtained in connection with defendants' activities and the activities of their various corporations." *Id.* On the day of the raid, Chandler, Reynolds, and Ragland were stationed at a small temporary structure. *Id.* They waited until 10:00 p.m. that evening, at which point Lukban contacted them and requested that they come to his office. *Id.* They went to his office, at which point "Chandler requested permission to copy or photograph some of the records and docu-

---

[1]This finding was based on parts of Chandler's testimony not directly reproduced in the record in the current proceeding, but quoted in the government's brief to this court in 1968, which is in the record in the current proceeding.

ments, [but] his request to copy or photograph them was denied." *Id.* The NBI said they would not allow copying until the NBI had inventoried the items. *Id.* Chandler was allowed to copy documents the next day. *Id.*

The district court held that Chandler had neither "instigated" nor "participated in" the raid. The court concluded that the NBI "had defendants under investigation" before Chandler did anything. *Id.* at 424. It concluded, further, that neither Chandler nor any other official "participated in, was present at, or a party to the raid." Knowledge of the raid on its own, the court held, was insufficient to require suppression. *Id.*

### 4.    Ninth Circuit Opinion

We affirmed in a 2-1 opinion on December 9, 1968. *Stonehill II*, 405 F.2d at 738. The majority opinion largely reiterated the factual findings of the district judge. One key difference, however, was that in discussing the selections of the Picture Folder that Taxpayers had introduced, the majority concluded that the "diagram prepared by Chandler of one premises and a memorandum prepared by him on another *inadvertently* fell into the hands of the NBI. They were not intended as directions to the NBI." *Id.* at 741 (emphasis added). The district court had found that the NBI had obtained the Picture Folder selections, but had not decided whether they had been inadvertently or intentionally provided to the NBI. The majority also discussed the incident, not mentioned by the district court, in which Chandler accompanied an NBI agent to the warehouse after the raid to help the NBI agent sort the files. *Id.* at 742. It also discussed the incident in which Chandler, after helping the NBI agent sort the files, drove to the U.S. Tobacco headquarters and "asked the NBI agent in charge if they had found the record storage room Spielman had told both Chandler and the NBI about. The NBI agent did not seem to know about it and asked Chandler to point it out. Chandler stepped into the office, pointed out generally the location of the record storage area, and left." *Id.*

The majority agreed with the district court's conclusions, specifically focusing on the following six factual findings:

> 1) No United States agent selected any evidence for use in a United States investigation or prosecution . . . . [T]he raids were initiated and planned by Philippine officers before United States agents became involved; the sole purpose of the raids was to obtain evidence for Philippine proceedings.

> 2) All activities of United States agents in connection with the raids took place before the raids commenced or after their termination.

> 3) Only after the raids were completed and the documents catalogued were the United States agents given permission to copy documents . . . .

> 4) There is no evidence that any United States agents were attempting to shortcircuit the Fourth Amendment rights of the taxpayers . . . .

> 5) The United States agents clearly objected to the raids, asking that the raids either not take place or at least that they be postponed.

> 6) When the United States agents made Spielman's information available to the Philippine authorities, they were not requesting any action whatsoever, much less instigating an unlawful search.

*Id.* at 746.

Judge Browning wrote an emphatic dissent. He first noted that the Philippine Supreme Court had already concluded that the raid violated the Philippine Constitution's equivalent of the Fourth Amendment. *Id.* at 747 (Browning, J., dissenting).

Judge Browning noted that the American agents contributed to the raid in "at least these respects":

> They brought Spielman and his information to the attention of the Philippine authorities, and, as the majority finds, "finally persuaded" Spielman to meet with them. Chandler made his home available to the NBI for meetings with Spielman, and for the "planning" and "preparation" of the raids. Chandler attended these meetings. In the course of "relaying information" from Spielman to the NBI, Chandler prepared a diagram and a memorandum of two of the premises to be raided. Chandler suggested an additional location to be raided; and his suggestion was adopted. Chandler, prior to the raids, "secured permission from Colonel Lukban to examine and copy records seized in the raids." After the raids had begun, Chandler and his two assistants, at Colonel Lukban's request, went to one of the premises being searched, and "pointed out" the "significant" books and records to be seized. From this search location the three American agents, on their own initiative, went to another. There Chandler inquired whether the NBI agents had found a records storage room which Spielman had mentioned, and upon discovering that they had not, Chandler pointed out the location of the storage room to the NBI agent in charge.

*Id.* at 749-50 (footnotes omitted).

Judge Browning criticized the majority for its "pallid and somewhat misleading description" of the relevant incidents. *Id.* at 750 n.19. He noted that Chandler, after helping the NBI agent sort the documents, did not leave right away. He examined bobbins of cigarette paper (thought to have been illegally imported by Stonehill) in the warehouse, when the "agent didn't seem to be familiar with the thing at all," and told the agent "that he probably better check with Colonel Lukban."

*Id.* Furthermore, at the U.S. Tobacco headquarters, Chandler not only told the agent to search a back room, but also showed him where the room was in the building. *Id.* at 750 n.20.

Finally, Judge Browning emphasized the "inadequacy of the trial court's findings," and pointed out that the majority filled the gaps with questionable factfinding of its own. *Id.* at 752. The district court had made no finding whether the purpose of the raid was to obtain evidence for use in an American tax prosecution. Yet the majority specifically found that the purpose of the raid was "to uncover violations of Philippine law, *not* to obtain evidence for the United States agents." *Id.* Judge Browning concluded that there was "substantial evidence" suggesting that the majority incorrectly characterized the purpose of the raid. *Id.* He also criticized the majority's finding that the diagram Chandler drew of the buildings to be raided "inadvertently" fell into the NBI's hands and was not intended to provide directions to the NBI, noting that the trial court had found only that the document had ended up in the NBI's possession. *Id.* at 753-54. Judge Browning pointed out that there was no evidence that its transfer to the NBI was, in fact, inadvertent. *Id.* at 754. Judge Browning concluded that "[a]t the very least . . . reconsideration by the trial court is plainly required." *Id.*

The Supreme Court denied certiorari. *Stonehill v. United States*, 395 U.S. 960 (1969).

### 5.    Renewed Motion to Suppress, Motion for Reconsideration, and Second Renewed Motion to Suppress

In February 1971, Taxpayers filed a renewed motion to suppress based on newly discovered evidence. *United States v. Stonehill*, 420 F. Supp. 46, 51 (C.D. Cal. 1976) (*Stonehill III*). The motion was based largely on an affidavit of Damaso Nocon, Lukban's right-hand man. Nocon's affidavit, executed in November 1970, told a very different story from that told by Hawley and Chandler. Nocon stated that he was an NBI

Special Agent and that part of his job was to "maintain[ ] liaison with agencies of the United States Government operating in the Philippines." Taxpayers introduced a copy of Nocon's Special Agent ID. Nocon stated that in 1961 Hawley began expressing interest in Stonehill. Nocon stated that "[b]ecause of Mr. Hawley's interest, and upon instructions of the NBI Director I commenced tapping Mr. Stonehill's telephones." Nocon turned these transcripts over to Hawley.

Nocon further stated that Chandler told him he was interested in making a tax case against Stonehill, and "hoped to obtain Philippine assistance in gathering evidence in the Philippines." Nocon stated that Chandler told him that after talking with Spielman he felt he could make a case against Taxpayers, but that he needed more documentary evidence.

Nocon stated that he met with Chandler and Hawley on an "almost daily basis" and talked to Chandler "at least four or five times a day." They "discussed and laid plans for the raids," and Chandler reviewed all information so the NBI "would be certain of raiding *all* places where any documents might be located. Together, we made a comprehensive list of these locations." Nocon described a meeting at the Philippine Columbian Club on February 6, 1962, attended by Hawley, Chandler, Secretary Diokno, Spielman, and Nocon. Nocon stated that Chandler told Secretary Diokno that the raid would receive full U.S. backing and that special U.S. agents would be flown over to assist in the raid. Chandler also "stated that he would try to arrange a meeting between Diokno and Attorney General Kennedy."

Nocon further stated that "[a]t Chandler's request" the NBI made photographs of all target areas for the raid. After this had been done, Chandler and Nocon reviewed the photographs together, and Chandler gave instructions in writing for what to do in each place. Nocon stated that because the NBI had "never before been involved in massive raids of this

kind," its officials "relied heavily on Mr. Chandler's apparent expertise."

Nocon also described Chandler's suggestion that they add the Army and Navy Club to the warrants, but stated that Chandler and Nocon went to see the Army and Navy Club together after leaving Lukban's house. Finally, Nocon stated that Chandler made a house available for the NBI to store the seized documents for free, "provided, however, that he be given exclusive use of a separate room for photo-copying the seized documents."

In response, the United States submitted an affidavit by Colonel Lukban, dated March 2, 1971. Lukban stated that he found Nocon's affidavit "inaccurate, misleading and false in a number of its allegations." He stated that Nocon was not a special agent because he did not have the educational qualifications. He said Nocon was his "confidential agent." Nocon had "no official duties or an official position which called for him to maintain liaison with foreign governments and police agencies." Nocon "never made a telephone tap for the NBI as he says in his affidavit, although he may well have made some typewritten transcripts from records. However, his function was strictly that of typing."

Lukban further stated that Nocon lied about Chandler's requests for help:

> I was in charge of the Stonehill investigation, not Mr. Nocon, and I was in charge of all the preparation for the raids, not Mr. Nocon nor anybody else. There were no joint preparations, US-Philippine, for the raids nor was there any joint strategy for the raids. I ordered the investigations into Stonehill's affairs long prior to meeting Spielman solely for purposes of Philippine law enforcement and I ordered the raids on Stonehill's businesses under the authority of then Secretary of Justice, Jose Diokno, with the

sanction of President Macapagal, solely for the purposes of Philippine law enforcement. These raids were not a joint effort between Philippine authorities and United States authorities and the raids were not made because of any request by United States authorities or for the purpose of helping Untied States authorities in any investigation of theirs.

Lukban stated that, although he let Chandler see the documents, it was not because Chandler had negotiated a deal. Rather, it was because Lukban believed "then and now that there should be cooperation and pooling of information among the various police agencies of the world." He stated that the NBI had conducted large-scale raids in the past, and did not need to rely on, and had not relied on, Chandler's expertise in preparing for the Stonehill raid.

The district court denied Taxpayers' Renewed Motion on May 26, 1971. *Stonehill III*, 420 F. Supp. at 51. Taxpayers filed a Motion for Reconsideration in August 1971. *Id.* In response the government submitted more evidence. In an affidavit filed September 16, 1971, John McCarthy, the government's lawyer throughout the litigation, stated that he had asked Powers, the IRS representative in Manila, to look into Nocon's status with the NBI. McCarthy stated that Powers had reported that Lukban told him that Nocon was never a Special Agent of the NBI, though Lukban gave Nocon an ID card (which had been introduced by Taxpayers) for his protection so he could legally carry a firearm. Powers told McCarthy that Lukban told him that Nocon was "merely an informer and he is not qualified educationally speaking to become a Special Agent of the N.B.I." attachments to his affidavit, McCarthy included a certification from the then-current NBI Director that Nocon does not appear in any of the NBI's payroll history, and that he served only as a Confidential Agent to Lukban, paid out of Lukban's discretionary funds. The government also submitted several other documents suggesting that Nocon had never worked directly for the NBI.

After hearing oral argument, the court denied the Motion for Reconsideration on November 11, 1971. *Id.*

In May 1975, in connection with the litigation of the substantive tax assessment issues, Taxpayers filed a second Renewed Motion to Suppress, arguing that new evidence discovered since 1968 required suppression. *Id.* In addition to the evidence just discussed, Taxpayers had Nocon's deposition, taken on September 4, 1974. Nocon testified that Lukban had appointed him the direct liaison with Chandler. He said that the planning of the raid "was a joint venture from the very beginning." He further testified that technical surveillance of Stonehill started in the early 1960s based on instructions from the FBI's Tokyo office.

The district court denied this motion, and rejected Taxpayers' substantive tax law claims, on July 23, 1976. *Stonehill III*, 420 F. Supp. at 46. Ironically, given that litigation was to continue for an additional thirty-five years, the district judge began by lamenting the "many hundreds of thousands of dollars" that had been spent litigating the case, the "more than 35 separate court sessions" that had been held, and the work put in by the three district court judges who had been assigned to the case at various times. *Id.* at 51. He also noted the difficulty caused by the "unavailability or noncooperation of important witnesses, including Stonehill and Brooks who refused to appear," as well as the allegations of misconduct by both sides. *Id.*

The court then addressed Taxpayers' two new arguments. First, based on Nocon's testimony, Taxpayers argued that U.S. officials were actively investigating Taxpayers much earlier than previous evidence had showed, and that Philippine authorities were acting at the direction of U.S. officials. *Id.* at 52. The district court found that Nocon's testimony was not credible, and concluded that the NBI conducted the raid for the purposes of Philippine law enforcement. *Id.* at 52-53.

Second, Taxpayers argued that the government's evidence came from illegal wiretaps. *Id.* at 53. The district court concluded that even if the wiretaps had been illegal, they were NBI wiretaps that had been installed in the course of the NBI's own investigation. *Id.* It noted that the only evidence to the contrary came from Nocon, whom the court did not believe. *Id.*

### C. Post-suppression Motion Litigation

In the same 1976 decision in which the district court denied the renewed motion to suppress, the district court ruled against Taxpayers on a series of substantive tax arguments. *Stonehill III*, 420 F. Supp. at 54-64. The court ruled against Taxpayers in several more orders concerning substantive tax law in 1980. *See United States v. Stonehill*, No. 65-127-GJS, 1980 U.S. Dist. LEXIS 16574 (C.D. Cal. April 19, 1980). We affirmed those rulings in 1983. *United States v. Stonehill*, 702 F.2d 1288 (9th Cir. 1983). In 1984, Stonehill (without Brooks) attempted to relitigate many of these substantive tax issues in Tax Court, but that court held that the district court's order, affirmed on appeal, was res judicata. *Stonehill v. Comm'r of Internal Revenue*, No. 1574-65, 1984 Tax Ct. Memo LEXIS 339 (U.S. Tax Ct. June 28, 1984).

In 1991, Taxpayers filed a Rule 60(b)(5) motion, seeking a declaration that the United States' judgment for income taxes had been satisfied. *United States v. Stonehill*, No. 91-35049, 1992 U.S. App. LEXIS 6498 (9th Cir. April 7, 1992). Taxpayers did not seek a modification of the district court's prior determination of liability. *Id.* at *2. But they contended that the district court had improperly prevented them from proving that the 1980 judgment was erroneous as to the amount owed. *Id.* at *2-3. We wrote in an unpublished memorandum disposition that "we are unwilling to permit taxpayers to go behind [the 1980] judgment to argue satisfaction of the judgment on the basis of a Rule 60(b)(5) motion filed ten years after entry of that judgment." *Id.* at *5. Taxpayers also

objected to the government's attempts to sell some of the property subject to tax liens, but we affirmed the sale of the last property subject to tax lien in 1996. *United States v. Stonehill*, 83 F.3d 1156 (9th Cir. 1996).

In 1998, Stonehill filed the first of many FOIA requests, seeking government documents relating to the raid. *See Stonehill v. IRS* ("*Stonehill IV*"), 534 F. Supp. 2d 1, 2 (D.D.C. 2008). Shortly thereafter, on August 20, 2000, Taxpayers began the current incarnation of this case by filing a motion in district court under Rule 60(b)(6) to vacate the original 1967 judgment, alleging that the government had committed fraud on the court. The district court denied the motion and Taxpayers appealed. In the meantime, the FOIA proceedings continued. They were long and contentious. Taxpayers accused the government of losing documents, intentionally releasing documents slowly, and over-redacting the documents it did release. The government repeatedly emphasized that Taxpayers' current attorney, Robert Heggestad, had not received many of the files previously assembled by Taxpayers' prior attorney and was thus making duplicative FOIA requests.

We heard Taxpayers' appeal of the district court's denial of the motion to vacate in 2002. In December 2002, we concluded in an unpublished memorandum disposition that the district court had abused its discretion "when it ruled on the motion to vacate while Stonehill and Brooks were still seeking potentially relevant evidence." *United States v. Stonehill*, 53 Fed. App'x 470, 471 (9th Cir. 2002). We noted that even in the time since the district court's ruling, Taxpayers had obtained more documents that could bolster their case, and that they still had FOIA requests pending. *Id.* We concluded that "[o]n remand, the district court should ensure that [Taxpayers] have a fair opportunity to present their argument to the court. It should assist them in obtaining relevant evidence and should not rule on their motion to vacate until it has received and considered all evidence that Stonehill and

Brooks may obtain within a reasonable time." *Id.* After nearly ten years of correspondence and litigation, the District Court for the District of Columbia ruled on all outstanding FOIA issues, mainly relating to redactions, on January 10, 2008. *Stonehill IV*, 534 F. Supp. 2d 1.

### D.  New Evidence Uncovered Through FOIA

Through their numerous FOIA requests, Taxpayers have uncovered an enormous number of documents relating to the raid. We provide an overview of this evidence in chronological order, divided by subject area.

### 1.  United States Government's Early Interest in Stonehill, and Potential Involvement in the Investigation of William Saunders, Taxpayers' Business Associate and Attorney

The earliest document mentioning Stonehill is a memorandum from the U.S. Embassy to the State Department, dated February 21, 1951, in response to the State Department's request for a "discreet investigation" into Stonehill's affairs. The memorandum describes Stonehill's tobacco business and his "reputation of not paying his full income tax." The Embassy in Manila says it will "continue to observe Mr. Stonehill's business operations and report any significant developments."

Interest in Stonehill appears to have been renewed nine years later. On April 27, 1960, IRS Agent James Griffin wrote to the audit division that "Mr. William W. Saunders, an attorney . . . , reported *in confidence*, that Harry S. Stonehill had forwarded a check from a Swiss bank account to Honolulu." (Emphasis in original.) The money was used to purchase land in Oregon. Griffin said that if "it is desired that further information be gathered on the above matter, please send the request as if the source was from some other area. Otherwise the source of information might be compromised." On July 21, an individual whose name has been redacted filed an

Application and Public Voucher for Reward for Original Information. Although there is no clear evidence supporting their contention, Taxpayers contend that this Application was filed by Saunders.

On June 30, 1960, Louis Blissard, the U.S. Attorney for the District of Hawaii, wrote a memorandum to Lukban, responding to Lukban's request for information concerning an indictment against a man named Ted Lewin. Although most of this memorandum concerns Lewin's indictment for illegal currency transactions, the memorandum mentions that part of the money Lewin was using was "actually money belonging to Harry Stonehill." Some of Blissard's information came from "William W. Saunders, a Honolulu attorney, who is in some business ventures with Stonehill." Saunders told Blissard that Taxpayers did not want Lewin to testify concerning Lewin and Stonehill's association in activities in the Philippines.

On August 16, 1960, the IRS Office of International Operations ("OIO") sent Chandler a memorandum forwarding Stonehill's 1958 tax returns to evaluate whether an audit was warranted. Chandler responded on August 31, 1960. Chandler stated that he had "for some time been aware of the need for investigation of Stonehill," but that it would be a difficult case that is "beyond our present capacity in view of current workloads." He informed the OIO that the Stonehill case will "of necessity remain in our unassigned backlog for an indefinite . . . length of time."

In September 1960, Blissard wrote a memorandum to Charles Rice, the Assistant Attorney General for Tax, calling his attention to Stonehill's activities, noting his belief that Stonehill "owes and has not paid large amounts of income taxes," and briefly explaining the basis for that belief. Shortly thereafter, Blissard sent at least one other similar memorandum to Rice, in which he wrote that he had spoken with Lukban, who had provided him with information concerning

Stonehill's financial dealings. Rice forwarded this information to the Commissioner of Internal Revenue.

We note two things about these early documents. First, although there was some U.S. interest in Stonehill prior to the appearance of Spielman, there was no action taken due to a lack of capacity. Second, during this period Saunders was giving information to U.S. authorities concerning Stonehill. There is no evidence, however, that Saunders was serving as Stonehill's attorney at that time.

### 2.    Initial Meeting with Spielman

Both Hawley and Chandler wrote memoranda describing their initial meetings with Spielman. Hawley's memorandum was sent to FBI Director Hoover[2] on January 2, 1962, and Chandler's memorandum was sent to the OIO on December 22, 1961.

According to Chandler's memorandum, Spielman recounted that Stonehill and Brooks left the Philippines during the 1961 Philippine presidential campaign due to attempts by the administration to extort political campaign funds. Stonehill and Brooks gave Spielman more control of the companies during their absence. Spielman said that he then discovered a "huge and evil fraud" Taxpayers were perpetrating. "[T]he extent of this infamy was a shock to him." Spielman realized that Stonehill would have enormous control over the regime of President Macapagal, who had just won the election. Stonehill had "engineered" the withdrawal of presidential candidate Rogelio de la Rosa, a candidate who had

---

[2]All of Hawley's memoranda are sent to "Director, FBI." It appears, however, that many of these memoranda are addressed to the heads of the relevant government divisions even when the memoranda are intended for less senior members of that division. Though it is not always clear who, in fact, received Hawley's memoranda, we refer to the memoranda as being written to Hoover.

entered the race based on a bribe from then-President Garcia, who thought de la Rosa would take some of Macapagal's votes. According to Spielman, Stonehill had signed agreements from Macapagal permitting Stonehill to name three members of the incoming cabinet and guaranteeing him important business concessions relating to Stonehill's near-monopoly on the importation of Virginia tobacco into the Philippines.

According to Spielman, when Stonehill and Brooks returned to the Philippines after Macapagal's victory, now-President Macapagal tried unsuccessfully to convince them to change their ways. Macapagal then told them they would have to leave the Philippines. At this point, according to Spielman, they realized how dangerous Spielman could be to them because of his knowledge of their illegal activities. Stonehill called Spielman to his suite on December 9, 1961. After Spielman told them he was upset about the extent of the illegal activity, Stonehill called in Brooks.

According to Hawley's memorandum, Spielman said that Stonehill "pulled a couple of pistols from his desk, ostentatiously played with them and mentioned what would happen to people who did not play ball." They then beat Spielman and knocked him unconscious. At the first interview with Hawley, Spielman had a very severe black eye, a swollen left cheek and side of his face, a bad cut inside his mouth, and a number of bruises on his chest and arms.

Although the story of the beating is almost certainly true, Spielman's motivations for speaking with Hawley and Chandler were likely less altruistic than Spielman suggested. In other memoranda, Hawley and Chandler suggest that they believed that Stonehill attacked Spielman only after Spielman attempted to blackmail Stonehill into giving him greater control of the company. The district court made a factual finding that Spielman copied the records he eventually brought to Hawley "to force the taxpayers to give him part ownership in

their business enterprises. When Spielman proposed this, they first beat him and then fired him. Spielman became fearful of what else they might do to him, so he went to United States officials for protection and for vengeance." *Stonehill III*, 420 F. Supp. at 53. Hawley wrote that he told Spielman that most of what Spielman described were violations of Philippine law over which he had no jurisdiction. He said there could be tax law violations, and he encouraged Spielman to meet with Chandler. Spielman agreed.

According to Chandler's memorandum, Spielman said he believed he was "in considerable danger of being murdered." Chandler wrote, "[W]e are inclined to agree that this is a very real possibility." Spielman, a Czech Jew and a Holocaust survivor whose parents were killed in concentration camps, said he was not afraid of Stonehill. He took "the position that he faced death many times during the war years in Europe, spent much time in concentration camps and lived constantly in fear of death. He became an American citizen in the hope and expectation that he would thereafter be a free man and he cannot now see himself subject to the threats of the Stonehill group." He said he would thus stay in the Philippines despite the risk.

Chandler noted in his memorandum that he had always suspected Stonehill of "an enormous fraud," but that they had not had the manpower to pursue it. He wrote that based on Spielman's evidence, he recommended that the OIO send at least a Special Agent and a Revenue Agent. He further noted, "We have also been given access to transcript[s] of telephone taps made by the local NBI and in part the information comes also from that source or has been confirmed thereon."

Over the next several weeks, both Hawley and Chandler sent multiple memoranda to their respective domestic offices. Beginning with a January 9, 1962, memorandum describing the potential Bill of Lading Act indictment against Stonehill's associate Ira Blaustein, Hawley sent regular memoranda to

Hoover detailing information provided by Spielman and updating Hoover on the progress of the investigation. He also sent a "VERY URGENT" memorandum on February 7, 1962, advising Hoover that Diokno had personally interviewed Spielman.

Chandler wrote fewer, but more detailed memoranda. In a January 10, 1962, memorandum to OIO, Chandler described an encounter with Howard Parsons, the Economic Counsellor for the Embassy. Parsons stated that "in the opinion of the Embassy it is imperative for American interests in the Philippines that some way be found to get Stonehill out of the Philippines and break his stranglehold here." Parsons suggested that Stonehill could "undermine the entire American effort and perhaps destroy democracy here." Chandler informed Parsons that he had begun an investigation. Chandler told Parsons that he doubted the maximum IRS effort could accomplish what the Embassy wanted. Chandler again requested from OIO that "agents be sent to Manila specifically to undertake this examination," but he realized that it was not easy to spare agents. Chandler emphasized, however, that tax compliance in the Far East generally is "highly unsatisfactory," and that the Stonehill case would be a good way "to create an effective and necessary enforcement image."

A memorandum to file from an employee at OIO, dated February 13, 1962, recorded the permanent assignment of Sterling Powers, an IRS Special Agent, to Manila, and suggested there would shortly be a second person assigned. Chandler wrote a memorandum to OIO the same day. Chandler informed OIO that one agent was insufficient, and that in order to undertake this investigation effectively, he would need the undivided attention of "at least a Special Agent and a Revenue Agent."

The newly discovered documents from this period are more detailed than previously available evidence, but they are generally consistent with the testimony of Hawley and Chandler

at the 1967 suppression hearing. Specifically, Chandler's discussion of wiretaps in his memoranda suggests that he and Hawley received these wiretaps only after speaking with Spielman, which comports with Hawley's deposition testimony that the NBI never gave him wiretaps prior to December 15, 1961. Furthermore, in Chandler's discussion of wiretap "transcript[s] of telephone taps made by the local NBI," he does not suggest that they had in any way helped the NBI establish the wiretaps.

### 3.    Diokno-Seigenthaler Meeting

In early February 1962, Robert Kennedy, then the Attorney General, made a trip to Hong Kong. In a February 7, 1962, memorandum to Hoover, Hawley reported that Secretary Diokno asked to meet with Kennedy "as Diokno would like to see him in Hong Kong so Attorney General will know about [Taxpayers'] activities and make sure that all American interested agencies involved, particularly Internal Revenue Service, will provide sufficient manpower for effective investigation." The U.S. Ambassador to the Philippines asked the U.S. Legal Attache in Tokyo to tell Kennedy that Taxpayers' case was the likely reason for Diokno's request. There is some suggestion, however, that Diokno wanted to meet Kennedy for "personal reasons." As a later memorandum made clear, "DIOKNO is youthful, energetic, and cuts through usual protocol channels, and has frequently been called 'the BOBBY KENNEDY of the Philippines' since he took office." At the instruction of the Ambassador, Hawley told Diokno that Kennedy's schedule was full.

Although Diokno was unable to meet with Kennedy, he did travel to Hong Kong, where he met with Assistant Attorney General John Seigenthaler on February 11, 1962. A February 12 Foreign Service memorandum to the U.S. Embassy in Manila reported that Diokno told Seigenthaler about Taxpayers' case and stated that Hawley and Chandler were "supposedly . . . sympathetic" to Diokno's "Hong Kong Mission."

Diokno further said he did not want to operate through "ordinary government channels" because Stonehill controlled a cabinet minister, the executive secretary president, and the entire Philippine Internal Revenue Board. Diokno requested that the

> US government supply him two tobacco experts in grading, drying and inventorying Virginia tobacco in order train his own people in investigation Stonehill's tobacco racket. Diokno also requests seizure books Stonehill New York representative Ira Glausten [sic] by Customs or Internal Revenue investigators be coordinated with his own department crackdown Brooks Bros. and Stonehill which tentatively scheduled take place end of February.

The memorandum requested that the Manila Embassy furnish "all details" of the case and "make immediate recommendation as to Attorney General's course of action." A summary of this memorandum was presented at the 1967 suppression hearing. A comparison of the summary and the actual memorandum reveals that the summary contains all of the relevant information contained in the memorandum.

On February 15, 1962, Hawley wrote a long memorandum to Hoover describing the events leading up to the Diokno-Seigenthaler meeting. He also recounted the descriptions of the meeting contained in the previous memorandum. He quoted the Manila Embassy's response to that memorandum, sent on February 13. The Embassy noted Chandler's request for the "immediate detail of agents to Manila to undertake both civil and criminal tax aspects of case." The Embassy also stated,

> It would be advisable for us to look thoroughly into case to determine what action US Govt might want take and to what extent we can assist Philgovt. Recommend therefore that an Internal Revenue Special

Agent be detailed to Manila for full-time work on
this case. On basis his findings US would then be in
position determine what further action would be nec-
essary.

Diokno also apparently told Hawley that he was waiting to
hear from the Embassy "what action would be taken to coor-
dinate investigation in the United States with DIOKNO's
desire for action by the end of February." Hawley concluded
the memorandum by requesting that the "Bureau provide
instructions concerning the extent to which cooperation
should be extended in these matters."

Taxpayers make much of this meeting between Diokno and
Seigenthaler and the three memoranda describing it. The
memoranda make clear that the U.S. Department of Justice
was interested in Taxpayers' cases. They also make clear that
Diokno was interested in coordinating his investigation,
including his planned raid, with the U.S. investigation. How-
ever, they contain no evidence that any U.S. official ever
acted on Diokno's requests for coordination; nor do they sig-
nificantly change the picture already drawn by previously
available evidence. In his affidavit filed in 1971, Lukban
stated that the United States never provided the tobacco
experts requested by Diokno. The United States had disclosed
the fact of the meeting in the original suppression hearing,
and the summary of the February 12, 1962, memorandum
provided to the district court contained all relevant informa-
tion concerning the meeting.

### 4.   The Raid

A few documents address the raid itself. The first is a mem-
orandum from Hawley to FBI Director Hoover on February
16, 1962. Hawley recounts that during the night of February
15-16, the main plant and warehouse of Philippine Tobacco's
flue-curing and re-drying operation burned to the ground, and
that arson was strongly suspected. Philippine Tobacco pro-

vided illegal tobacco to U.S. Tobacco. According to Hawley the fire "probably destroyed large portion of evidence of illegal tobacco dealing." Hawley wrote that Lukban had inferred from the fire that Stonehill knew of the NBI investigation, and that Lukban therefore wanted to act quickly. He scheduled the raid and arrest for February 24.

Hawley sent a memorandum to Hoover a week later, on February 23, 1962. He wrote, "Lukban advised today planned raid instant matter delayed for further preparation. No date set."

Hawley sent a final pre-raid memorandum to Hoover a week later, on March 2, 1962. He wrote:

> The raids planned on the Stonehill companies including U. S. Tobacco Corporation for February 24, 1962, are now to be put into effect on March 3, 1962. During the course of these raids they said effort will be made to obtain documents relating to the import of the tobacco paper through the subject and Universal New York [i.e. the BLA criminal case]. If any discrepancies appear as alleged by MENHART SPIELMAN a substantial case will be in the making.

> It is anticipated that large masses of papers and files will be accumulated in the raids, photographed, and returned because it is presumed that STONEHILL will use every legal device to protect his interests. Both DIOKNO and LUKBAN are very aware of the Bureau's interest in these matters and will advise of any pertinent developments.

The crucial document concerning the lead-up to the raid is the Picture Folder. Through FOIA requests, Taxpayers were able to obtain not only the two pages introduced during Chandler's testimony at the 1967 suppression hearing, but also a

further sketch and the twenty-two photographs that the second page had referenced. The sketch depicts two buildings, marked at various places with circled numbers one through twenty-two. On the side of the sketch is written, "US Tobacco Co." and "Note: Numbers indicate the point of view of the corresponding pictures." The handwriting is not Chandler's. The twenty-two photographs depict several buildings from different angles. They are clearly the photographs referenced both by one of the pages introduced in the original suppression hearing and by the sketch uncovered through FOIA. Several of the photographs have notes or instructions written on them in Lukban's handwriting. In reference to one door, Lukban wrote: "To be *thoroughly* searched. *break open*." (Emphasis in original.) Nearly all of the other comments are identifications of what is stored in specific places in the buildings, or whose offices are in the buildings.

The documents just described make several things clear. First, given that Hawley sent a memorandum on March 2 informing Hoover that the raid was planned for the next day, it is clear that Hawley lied in his deposition when he said that he did not know about the timing of the raid until he read about it in *The Manila Times* the next morning. Second, the documents show a keen U.S. interest in the raid, and they show at least an informal agreement that Lukban would make an effort to obtain documents useful to the United States in its tax case and possible criminal case. However, they also demonstrate that it was Lukban and the NBI who were organizing and planning the raid. There is nothing to suggest that Hawley or Chandler was involved in selecting the date. Indeed Hawley, who was always very diligent about sending updates to FBI headquarters in Washington, did not inform Hoover of the date of the raid until the day before the raid occurred. Third, although the Picture Book demonstrates that Chandler wrote notes that were used by Lukban to identify targets for the raid, it is not clear how the now-complete Picture Book demonstrates Chandler's involvement any more than did the two pages from the Picture Book introduced in the district

court during the original suppression hearing. Finally, none of the documents contradicts Chandler's testimony that he was simply recording information given to him by Spielman.

### 5. Access To Documents After the Raid

On March 5, two days after the raid, Hawley wrote to Hoover informing him that the raid had occurred, and that "[c]opies of documents will be obtained as soon as possible." Later that same day, he wrote to Hoover, "Director Lukban providing copies of all documents found. All information may be used openly." Between March 7 and 16, Hawley wrote several more memoranda to Hoover attaching copies of cables and letters from the raid that were of interest in a criminal Bill of Lading Act case against Blaustein. The first two memoranda do not specify how Hawley obtained the documents, but the last memorandum specifies that they were "furnished" by the NBI. Over the following months, Hawley sent several more such memoranda forwarding documents obtained in the raid, presumably provided to him by the NBI.

Chandler's post-raid memoranda show that he was more involved than Hawley in negotiating access to the seized documents. In a March 16, 1962 memorandum to OIO, he notes that the local authorities asked Chandler to provide space for storage of the Stonehill records "in order that we could have full access to them and both of us would have an opportunity to fully determine and appraise what had been acquired." Chandler described how he initially thought it would be necessary to rent space, but he had since "been able to secure a donation of private space from an American and the records were moved to that location yesterday. They are now fully available whereas previously physical conditions considerably limited our access." Presumably without hearing that the question was moot because Chandler had obtained storage space for free, a DOJ attorney had researched whether paying for the storage of the records seized by the NBI would create problems for the government's planned "silver platter doc-

trine" defense. The attorney concluded that "the proposed payment would not jeopardize the criminal case" and recommended that the payment be made.

Chandler initially complained that he did not have sufficient equipment to copy the documents. However, by March 21 he had obtained a copier from another agency, and IRS Agent Powers reported receiving "splendid cooperation from the local authorities." In a progress report filed by Powers covering the period of March 21 to April 20, Powers reported that the NBI had "over 100 employees working 12 hours a day six days a week . . . trying to inventory and index these records." Powers reported that they were working as quickly as possible because of concern that Stonehill might convince the Supreme Court of the Philippines that the NBI should return the documents.

A memorandum from IRS Agent Ragland to OIO on October 10, 1962, paints a slightly different picture of American access. Ragland wrote, "We have not had free access to the records since June 27." He further stated that the American officials "have never actually had unlimited access to the records, and our photographed documents were obtained only after patiently dealing with individual groups of agents." Further, "The NBI did not attempt to audit or put the records in any order, but merely indexed them for their own specific purpose."

Some further details are contained in a long report by Lewis Gleeck, the Consul General at the U.S. Embassy in Manila. Gleeck divided the document work into three phases. The first was from March 3 to March 22, during which Gleeck reported frantic work by both the NBI and Stonehill's lawyers. Gleeck noted that the NBI had not expected to get so much material. The second phase began on March 22, when the Philippine Supreme Court issued a preliminary injunction against the use of the documents. This caused a lull in document review. The third phase began on June 30, when the

Supreme Court lifted the injunction. Gleeck did not describe the U.S. involvement in great detail. Most of his memorandum recounted the disappearance (and presumed murder) of Spielman, and the subsequent investigation and trial of Spielman's alleged abductors. Gleeck's report does, however, create the impression that, at least from the perspective of the U.S. Embassy, the raid and investigation were an NBI operation. The only discussion of U.S. activity in the memorandum concerned efforts to protect Stonehill's rights as an American citizen. Gleeck congratulated the Embassy on its "policy of watchful vigilance, as opposed to direct interference in the case."

The only other mention of access to documents is contained in a memorandum from Donald Durkin, the Chief of the IRS Intelligence Division, to Chandler. This memorandum was not sent until October 17, 1962. Durkin told Chandler that Lukban had visited his office and had told him that "Mr. Chandler and Mr. Powers could have access to any information that was in the possession of the National Bureau of Investigation. He further stated that his agents had been instructed to cooperate with Mr. Chandler and Mr. Powers." Because this memorandum referenced a request from the "Manhattan District," it was likely related to the criminal Bill of Lading Act case against Blaustein.

## 6.   Documents Prepared in Connection with Litigation

Three documents, prepared in connection with the anticipated litigation in Taxpayers' civil tax case, were revealed through their FOIA requests. They are: a document summarizing an interview of Chandler conducted by two government attorneys in Rome in February 1966; an internal IRS memorandum summarizing the factual and legal background to the suppression motion; and a memorandum from IRS Agent Sterling Powers to OIO concerning the Picture Folder (the "Powers Memorandum").

### a.    Chandler Interview

On February 11, 12, and 13, 1966, lead attorney McCarthy and Harlow Huckabee, another DOJ attorney, interviewed Chandler in Rome. This interview took place shortly before Chandler's deposition. Only Chandler, McCarthy, and Huckabee were present.

Most, though not all, of the information in the document summarizing this interview is consistent with evidence presented during the 1967 suppression hearing. Chandler told the attorneys that because "the F.B.I. and the N.B.I. are corresponding agencies . . . there was continuing cooperation and an implied agreement that the F.B.I. and the N.B.I. would help each other as much as possible." Chandler told them that he "attempted to have the Philippine officials delay the search and seizure action until a special agent arrived who would have more knowledge of the criminal aspects of the case than Chandler did," which suggested that Chandler instigated the delay of the raid from February 24 to March 3.

Chandler stated that during the meetings in his house he paid attention to what was being said, but "Philippine officials made the decisions." He stated that Spielman was often confused. The memorandum states, "[A]t one point Chandler said that he helped Spielman draw a sketch of locations involved in the search and seizure. He does not know what Spielman did with the sketch, but assumes that Spielman made it available to the N.B.I." This statement casts doubt on Chandler's failure to remember the sketch at the suppression hearing. It is unlikely that Chandler would remember the sketch clearly in February 1966, as the government was preparing for trial, but fail to remember it only a year later during the suppression hearing for that very trial. It does, however, support Chandler's assertion that the sketches simply recorded Spielman's story. It also supports Chandler's statement that he gave the sketch and notes to Spielman, rather than directly to the NBI.

Chandler told the attorneys that at the meetings at his home the NBI agents often played selections from their wiretaps of Stonehill. Chandler said that he knew these wiretaps had been going on for a long time. He said that he was not particularly interested in them. He was not aware whether the NBI continued the wiretaps after the raid, but he said he would not be surprised if they had. Chandler said the NBI had been tapping Stonehill long before the IRS became involved in the investigation of Stonehill, and that the IRS had never been involved in wiretapping.

Chandler also said why he was interested in ensuring that the NBI would search the Army and Navy Club. He recounted that during one conversation, Spielman had said that a man named Murray Otstott had told Spielman that he had a room at the Army and Navy Club where he kept a safe and files for Stonehill. Chandler was later at the Club and asked about this room. The Club had no room for Otstott, but did have a room for Karl Beck, another Stonehill associate. Chandler remembered this when he went to Lukban's house the night before the raid. Chandler stated that on the night of the raid, when Lukban called him at ten p.m., Lukban told him not only that "[w]e hit the jackpot," as Chandler testified, but that "we hit the jackpot at the Army and Navy Club."

In describing what happened on the night of the raid, Chandler provided more details than he would later provide in his testimony. When he, Ragland, and Reynolds went to the warehouse at Lukban's request to help the hapless NBI agents, in addition to helping to sort the documents, Chandler instructed the agents to seize some mislabeled cigarette paper Spielman had said would be important. Chandler became worried the NBI had missed a back room at the main U.S. Tobacco office. This room was in a sketch that Chandler had helped Spielman prepare. Chandler said that he went to the office and found that the NBI had indeed failed to search this room. Chandler pointed the room out to the NBI agent, but then left and did not know what was found in that room.

Finally, Chandler discussed his work arranging for the storage of the seized documents. His friend, Colonel Seriano, who ran the San Miguel Brewery, had a lot of extra space. In part by emphasizing that "Chandler was also interested in the matter," a redacted NBI official (likely Lukban) convinced Colonel Seriano to let them use the space.

### b.    IRS Memorandum of Fact and Law

A one-hundred-page government Memorandum of Fact and Law is dated March 4, 1966. Although it is not entirely clear who wrote this memorandum, it appears to come from the IRS Chief Counsel's office. The memorandum was prepared in anticipation of Taxpayers' motion to suppress, and it contains an analysis of Taxpayers' anticipated arguments. We will refer to it as the "IRS Memorandum."

The IRS Memorandum begins by discussing wiretapping activities. This section of the memorandum is quite heavily redacted, particularly the names of the individuals who worked on wiretapping in the Philippines. The memorandum describes a meeting with an official, whose name is redacted, who was a CIA employee in the Philippines during this time. From a later memorandum that the government did not redact, it seems clear that this official is CIA agent Joseph McGee. We will therefore refer to this redacted official as McGee. McGee stated that he did "furnish[ ] technical advice and assistance to the N.B.I. in various investigative techniques, including telephone taps. In addition, U.S. equipment (including wiretap equipment) was made available to the N.B.I." McGee further stated, however, that "he had no knowledge when the N.B.I. taps of Stonehill and his associates may have started. Furthermore, he stated he was never personally involved in tapping the wires of Stonehill or his associates, nor was he involved in giving direct advice or assistance with reference to tapping the wires of Stonehill or his associates." Even when it was pointed out to McGee that Hawley and Chandler had seen some of these wiretaps, McGee said "he

knew nothing about those transcripts and had never seen them."

McGee further discussed someone in the NBI, whose name is redacted, as his "main N.B.I. contact." This person's speciality was telephone taps. McGee also said that this person might have been paid money by the CIA, but he was not sure. The same memorandum reports Chandler as stating that he "had a number of conversations with Nocon indicating that Nocon was a wiretap expert," suggesting that Nocon could have been McGee's contact. Chandler also stated that "Nocon, at some earlier time, may have done some investigative work for a United States military service." However, at various points in the discussion of McGee's contact, Nocon's name is not redacted while the contact's name is, suggesting that McGee's contact may not have been Nocon.

In discussing U.S. participation in the raid, the IRS Memorandum primarily focuses on Chandler's February 11-13 statements to McCarthy and Huckabee in Rome, the Diokno-Seigenthaler meeting in Hong Kong, events on the day of the raid, and the storage of documents after the raid. It describes Chandler's memorandum recounting Parson's comment that it was crucial for the United States to "get Stonehill out of the Philippines." The IRS Memorandum describes Chandler's memorandum as a "particularly sensitive area indicating an underlying interest and, in effect, participation on the part of the State Department."

The IRS Memorandum concluded that there was significant participation by U.S. personnel in the raid:

> It appears that the activities of United States officials in preparation and planning for the raids and on the day of the raids were significant. These include [redacted, presumably McGee]'s activities in connection with the wiretapping; the planning meetings in Chandler's home; Chandler's assistance in draw-

ing a sketch of locations to be raided; Chandler's action the night before the raid in requesting that a warrant be issued for the Army and Navy Club; the fact that on the night of the raid Chandler pointed out to the N.B.I. agent at the United States Tobacco Company warehouse the significance of the rolls of cigarette paper; and the fact that on the night of the raid Chandler pointed out to the N.B.I. agent at the United States Tobacco Company office the significance of the back room. These and other indications of cooperation and participation outlined above are sufficient so that our courts would probably evaluate this matter *de novo*.[3]

One of the last sections of the IRS Memorandum describes post-raid developments in Philippine politics. The election of Ferdinand Marcos as President in 1965 began a wave of anti-American sentiment in the Philippines. This led to the removal of Lukban as NBI Director. The new Secretary of Justice, Jose Yulo, announced that working for the CIA would be considered treason. Yulo described the attempts by U.S. Treasury officers to take depositions of Philippine officials in the Stonehill case as an "encroachment on our sovereignty." The anti-American sentiment of the new Marcos regime created serious problems for U.S. officials working on Taxpayers' case. IRS Agent Powers reported that Nocon had been fired along with Lukban, and that Nocon had been "one of the best friends we have had in the Philippines over the past four years." As a result of Lukban and Nocon's firing, "cooperation from the N.B.I. has been cut off." Lukban and Nocon told Powers that they thought that they were fired as a favor to Stonehill, who had given Marcos money earlier in his political career. The IRS Memorandum concludes that proceeding with

---

[3]Although it is unclear what the IRS intended when it stated that courts would "evaluate this matter *de novo*," it likely meant that courts would treat this as action by the U.S. government and apply traditional Fourth Amendment principles.

the case against Taxpayers would be very difficult when faced with such opposition from the Philippines.

### c.    Powers Memorandum

IRS Agent Powers sent a memorandum to lead attorney McCarthy on September 27, 1967, while the original district court decision was on appeal. (The district court's order was entered on October 16, 1967, and we heard argument on December 9, 1968.) This Powers Memorandum describes Powers's success in obtaining a copy of the full Picture Book, two pages of which had been introduced during the district court suppression hearing. Powers wrote:

> I have been furnished access to and allowed to reproduce the Picture Book of the buildings of the U.S. Tobacco Company by a confidant within the NBI. This picture folder . . . was prepared before the raid to identify the buildings to be raided and, where possible, to show the location of the records to be taken in the raid. Each picture is numbered, 1 through 22. Also, there is a map drawn on very thin paper showing the streets and locations of each building by a number in a circle.

> I have added to this picture folder a copy of the handwritten notes of Robert L. Chandler which were introduced in court by the defense. These notes very definitely tie into the pictures and map by reference numbers. The pictures and map had holes punched through them and were fastened into the manila covering-folder by an ACCO fastener. The holes in Chandler's notes fit precisely with the holes punched in these pictures and folder.

> Before gaining access to this picture folder, I talked with Col. Lukban about the existence of a possible picture folder. He was certain that such a

folder was prepared, but his recollection of it was very dim. He and Danny Nocon were of the opinion that Chandler's notes were prepared by him for the benefit of Col. Lukban.

I have been told by our confidant that the handwritten notes on pictures Nos. 4, 5, 8, 9, 10, 12, 15, 16, and 20 were those of Col. Lukban. I questioned Col. Lukban and Danny Nocon with regard to Page No. 2 of Chandler's notes, which had been written on perforated paper. Col. Lukban stated he never used that type of paper in his office and furnished me with a sheet of a "Don't Forget" pad, which he always used in his office while Acting Director of the NBI . . .

I believe I have narrowed to one of four persons who furnished the defense with Chandler's notes and possibly a copy of the picture folder. It is believed that this person or persons are still employed by the NBI. We are hopeful their identity will be determined in the near future.

Neither the full Picture Book, nor the information in the Powers Memorandum, was provided to this court or to Taxpayers, even though it was in the government's possession during the pendency of the appeal to us.

Much of the information in the Powers Memorandum would not have been particularly important during the suppression hearing. The memorandum reveals that the handwritten notes on the pictures were written by Lukban, not Chandler. Thus, all of Chandler's handwritten instructions were before the district court. Powers's statement that the Picture Book was "prepared before the raid to identify the buildings to be raided" is not new information, as it was clear that Chandler's notes introduced at the hearing were prepared for the same purpose.

The most troubling aspect of the Powers Memorandum is its statement that Lukban and Nocon were of the "opinion that Chandler's notes were prepared by him for the benefit of Col. Lukban." Chandler testified at the suppression hearing that he made the notes to help Spielman. This was a key issue during the 1968 appeal. Judge Browning criticized the majority for concluding, with no basis in the record, that the Picture Book had "inadvertently" fallen into the hands of the NBI. If Lukban and Nocon were correct that Chandler prepared his notes for Lukban, as stated in the Powers Memorandum, it is clear that the NBI did not come into possession of the Picture Book "inadvertently."

The Powers Memorandum is also troubling in its suggestion of an attempt to discover who provided the two pages of the Picture Book to Taxpayers. Powers's statement that he is attempting to discover who "furnished" the defense with Chandler's notes, and his hope that the person's identity "will be determined in the near future," suggests prior possession of the full Picture Book by the government, as well as a conscious attempt by the government to withhold the Picture Book from Taxpayers.

## E.    Proceedings after Remand

After our 2002 remand on Taxpayers' fraud-on-the-court claim, many documents (described above) were obtained by Taxpayers through their FOIA requests. While the district court had the case on remand, Stonehill filed a civil suit against Saunders' Estate in Hawaii state court, alleging that by informing against him Saunders had violated his duties of confidentiality and undivided loyalty, and had cost Stonehill millions of dollars. The state court jury concluded that Saunders had breached his duties of confidentiality and undivided loyalty, but awarded no damages.

On July 14, 2010, the district court held that the government did not commit fraud on the court. Taxpayers timely appealed.

## II.   Standard of Review

In general, we review denials of motions to vacate for abuse of discretion. *Am. Games, Inc. v. Trade Prods., Inc.*, 142 F.3d 1164, 1166 (9th Cir. 1998); *Nat. Union Fire Ins. Co. v. Seafirst Corp.*, 891 F.2d 762, 765 (9th Cir. 1989). Because Taxpayers argue that fraud was committed on this court as well as the district court, Taxpayers could have brought the motion to vacate directly in this court. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), *overruled on other grounds by Standard Oil v. United States*, 429 U.S. 17 (1976); *Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 899 (2d Cir. 1985) (appellate court has "the power to vacate its own judgment upon discovery that a fraud ha[s] been perpetrated upon it"). Given that Taxpayers could have brought their motion in this court, Taxpayers argue that this court should review the district court's decision *de novo*. We need not decide whether abuse of discretion or *de novo* review is the proper standard because we conclude that under either standard Taxpayers have failed to carry their burden of proving fraud on the court.

For purposes of the standard of review, we treat Taxpayers' *Throckmorton* claim as a motion to vacate, and we review the district court's decision for abuse of discretion. *Am. Games*, 142 F.3d at 1166.

## III.   Discussion

Taxpayers argue that the district court's 1967 decision denying Taxpayers' suppression motion should be vacated for two reasons. First, they argue that the judgment should be vacated because the government committed fraud on both the district court and this court in defending against the suppression motion. Second, they argue that the government's use of William Saunders, Taxpayers' sometime attorney, as an informant is an independent basis for vacating the district court's

1967 decision under *United States v. Throckmorton*. We evaluate these arguments in turn.

### A.   Fraud on the Court

Taxpayers' primary argument is that their conviction should be vacated because the government committed fraud on the court during the 1967 suppression hearing and during the subsequent appeal. We first discuss the legal standard for fraud on the court and then analyze Taxpayers' specific claims of fraud on the court.

### 1.   Legal Standard

**[1]** Courts have inherent equity power to vacate judgments obtained by fraud. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *In re Levander*, 180 F.3d 1114, 1118-19 (9th Cir. 1999). Rule 60(b), which governs relief from a judgment or order, provides no time limit on courts' power to set aside judgments based on a finding of fraud on the court. 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2870 (2d ed. 1987). We exercise the power to vacate judgments for fraud on the court "with restraint and discretion," *Chambers*, 501 U.S. at 44, and only when the fraud is established "by clear and convincing evidence," *England v. Doyle*, 281 F.2d 304, 310 (9th Cir. 1960).

> Out of deference to the deep-rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. *United States v. Throckmorton*, 98 U.S. 61. But where the occasion has demanded, where enforcement of the judgment is "manifestly unconscionable," *Pickford v. Talbott*, 225 U.S. 651, 657[ (1917)], they have wielded the power without hesitation.

*Hazel-Atlas Glass Co.*, 322 U.S. at 244-45.

We have struggled to define the conduct that constitutes fraud on the court. Because the power to vacate for fraud on the court "is so great, and so free from procedural limitations," 11 Wright & Miller § 2870, we have held that "not all fraud is fraud on the court," *Levander*, 180 F.3d at 1119. The line between mere fraud and fraud on the court has been difficult to draw. "[M]ost attempts to state it seem to us to be merely compilations of words that do not clarify." *Toscano v. Comm'r*, 441 F.2d 930, 933 (9th Cir. 1971). "Perhaps the principal contribution of all [the] attempts to define 'fraud on the court' and to distinguish it from mere 'fraud' is as a reminder that there is a distinction." 11 Wright & Miller § 2870.

In determining whether fraud constitutes fraud on the court, the relevant inquiry is not whether fraudulent conduct "prejudiced the opposing party," but whether it " 'harm[ed]' the integrity of the judicial process." *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989). Fraud on the court involves "far more than an injury to a single litigant." *Hazel-Atlas*, 322 U.S. at 246.

> [T]he inquiry as to whether a judgment should be set aside for fraud upon the court under Rule 60(b) focuses not so much in terms of whether the alleged fraud prejudiced the opposing party but more in terms of whether the alleged fraud harms the integrity of the judicial process . . . .

*In re Intermagnetics America, Inc.*, 926 F.2d 912, 917 (9th Cir. 1991).

A fraud "connected with the presentation of a case to a court" is not necessarily a fraud on the court. 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2870 (2d ed. 1987).

> "Fraud on the court" should, we believe, embrace only that species of fraud which does or attempts to,

defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.

*In re Intermagnetics America, Inc.*, 926 F.2d 912, 916 (9th Cir. 1991) (quoting 7 J. Moore & J. Lucas, Moore's Federal Practice ¶ 60.33, at 515 (2d ed. 1978)).

**[2]** Mere nondisclosure of evidence is typically not enough to constitute fraud on the court, and "perjury by a party or witness, by itself, is not normally fraud on the court." *Levander*, 180 F.3d at 1119. Some courts and commentators have suggested that perjury should not usually constitute fraud on the court unless "an attorney or other officer of the court was a party to it." 11 Wright & Miller § 2870.

Most fraud on the court cases involve a scheme by one party to hide a key fact from the court and the opposing party. For example, in *Levander* a corporate officer testified in a deposition that the corporation had not sold its assets, and a bankruptcy court subsequently entered a judgment against only the corporation. *Levander*, 180 F.3d at 1116-17. It turned out that the corporation had in fact transferred all of its assets to a related partnership. *Id*. We held that the false testimony constituted fraud on the court, and the bankruptcy court was allowed to amend its order to include the partnership as an additional party to the judgment. *Id.* at 1122-23.

A similar example is *Pumphrey*, in which Melvin Sparks was killed when he dropped a handgun made by K.W. Thompson Tool Company ("Thompson"). The gun fired, shooting him through the heart. *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995). The plaintiffs, Sparks's widow and children, alleged that the gun's safety devices had been engaged at the time of the accident but had failed to work. *Id.* At trial, Thompson introduced a video

showing tests in which a gun had been dropped from various heights with the safety devices activated. *Id.* The gun never fired in the video, and Thompson represented that it was not aware of any safety tests in which the gun did fire. *Id.* After judgment had been entered in favor of Thompson, however, plaintiffs learned that in some tests the gun had fired, and that the Thompson officials had known this at the time of their earlier representations to the contrary. *Id.* at 1131-32. The district court vacated the original judgment for fraud on the court, and we affirmed. *Id.* at 1134.

**[3]** In order to show fraud on the court, Taxpayers must demonstrate, by clear and convincing evidence, an effort by the government to prevent the judicial process from functioning "in the usual manner." They must show more than perjury or nondisclosure of evidence, unless that perjury or nondisclosure was so fundamental that it undermined the workings of the adversary process itself.

## 2.    Fraud on the Court

The central issue, indeed almost the only issue, during the 1967 suppression hearing was the extent of U.S. involvement in the NBI raid on Taxpayers' businesses. Taxpayers sought to prove that the U.S. involvement was so great that the "silver platter" doctrine did not apply, with the result that the seized documents should have been suppressed. *See Brulay v. United States*, 383 F.2d 345, 347-48 (9th Cir. 1967). Taxpayers contend that the government committed fraud on the court in misrepresenting the extent of U.S. involvement. We discuss Taxpayers' arguments in decreasing order of persuasiveness.

### a.    Picture Book and Powers Memorandum

Taxpayers' strongest arguments concern the government's failure to disclose the full Picture Book and the information it obtained through the Powers Memorandum. As we discuss above, after the district court's 1967 decision but before oral

argument on appeal, IRS Agent Powers sent a memorandum from Manila to McCarthy, the government's lead attorney at trial and on appeal. Powers told McCarthy that he had a copy of the full Picture Book, and that it had been "prepared before the raid to identify the buildings to be raided and, where possible, to show the location of the records to be taken in the raid." Powers clarified that Chandler's notes, which Taxpayers had introduced at the district court, "very definitely tie into the pictures and map by reference numbers." Powers also reported that Lukban and Nocon told him that "Chandler's notes were prepared by him for the benefit of Col. Lukban."

Despite receiving the Powers Memorandum before oral argument, McCarthy never informed Taxpayers, or us, that the government had a copy of the full Picture Book. Nor did he inform Taxpayers that he now knew, based on the Powers Memorandum, that both Lukban and Nocon "were of the opinion" that Chandler had written his notes in the Picture Book "for the benefit of Col. Lukban." In describing the two parts of the Picture Book then in the record (i.e. the parts introduced by Taxpayers before the district court), McCarthy had filed an appellate brief describing Chandler's testimony that "he did not give these or like papers to anyone other than the informer Spielman," and that "he did not remember giving the exhibits to Colonel Lukban, the NBI, or Secretary Diokno." McCarthy wrote in the brief that "[t]here is absolutely no evidence in the record that these two exhibits were ever in the possession of the NBI other than the hearsay suggestion made by counsel for the appellants in his examination." Finally, McCarthy wrote, "By no stretch of the imagination can these two exhibits be characterized as instructions or directions by Mr. Chandler to the NBI or to anyone else."

[4] In light of the Powers Memorandum and the complete Picture Book that we now know were in the government's possession, we conclude that McCarthy was not entirely forthright in his representations to this court. He accurately

described Chandler's testimony before the district court, and accurately described the state of the record in that court. McCarthy's statement that Chandler had not given the notes directly to Lukban was supported by what Chandler had told McCarthy in Rome. But McCarthy's statement that there was "absolutely no evidence in the record that these two exhibits were ever in the possession of the NBI," when he had recently received a memorandum stating that those very exhibits were "prepared before the raid to identify the buildings to be raided and . . . to show the location of the records to be taken," and his statement that the exhibits cannot be "characterized as instructions or directions by Mr. Chandler to the NBI," were not forthright. They concealed, rather than revealed, the true state of affairs known to the government.

**[5]** Nevertheless, we conclude that McCarthy's failure to produce the full Picture Book, as well as his misleading statements, had limited effect on the district court's decision. First, neither the full Picture Book, nor the information contained in the Powers Memorandum, would have significantly changed the information available to the district court. The portion of the Picture Book not before the district court consisted of the photographs to which Chandler's notes correspond and the instructions written on those photographs. Although Taxpayers rely heavily on the instructions written directly on the photographs, the Powers Memorandum states that those instructions were written by Lukban, not Chandler.

**[6]** Second, all of McCarthy's representations to which Taxpayers take exception are contained in the section of the government's brief responding to Taxpayers' argument that the parts of the Picture Book introduced in the 1967 suppression hearing "are instructions by Mr. Chandler to the NBI as to how to conduct the raids." The government responded to this argument by writing:

> Mr. Chandler freely admitted that most of the handwriting on these two exhibits was his, but that

some of the handwriting . . . appeared to be that of others and that the diagram part was not his because he had never been to the buildings drawn thereon. He stated that he did not remember drafting these specific exhibits but that he did make such notes and drawings when interviewing the informer Spielman and he drafted such things at Spielman's request for the purpose of reducing Spielman's story to paper. Mr. Chandler stated that the language in these two exhibits was Spielman's language and that all the information on these exhibits came from the informer Spielman and that he never had been to or made any personal investigation of the described premises himself. Further, Mr. Chandler explained that he did not give these or like papers to anyone other than the informer Spielman and that he did not remember giving the exhibits to Colonel Lukban, the NBI, or Secretary Diokno. . . There is absolutely no evidence in the record that these two exhibits were ever in the possession of the NBI other than the hearsay suggestion made by counsel for the appellants in his examination.

By no stretch of the imagination can these two exhibits be characterized as instructions or directions by Mr. Chandler to the NBI or to anyone else. The only logical explanation for [the exhibit] is that it contains responses or answers from a person being interviewed.

[7] Taxpayers are correct that the Powers Memorandum makes clear, contrary to the last sentence of the first quoted paragraph, that the Picture Book exhibits were in the possession of the NBI. The Powers Memorandum also suggests that Chandler wrote his notes intending that they be given to the NBI. Taxpayers are also correct that the question of whether Chandler's notes were intentionally provided to the NBI was discussed both in the district court opinion and in our original

opinion. *See Stonehill I*, 274 F. Supp. at 422 (noting that Chandler's notes "came into possession of the [NBI]"); *Stonehill II*, 405 F.2d at 741 (noting that Chandler's notes "inadvertently fell into the hands of the NBI"); *id.* at 753 (Browning, J., dissenting) ("The majority finds that [Chandler's notes] 'inadvertently fell into the hands of the NBI' . . . ; the district court found only that these documents 'thereafter came into the possession of' the NBI.").

**[8]** The primary focus of the government's argument in its brief, however, and the focus of our majority opinion in 1968, was not on whether Chandler intended that the notes be transmitted to the NBI. Rather, the focus was on whether the notes were instructions from Chandler, or were simply Spielman's information as recorded by Chandler. In recounting the facts, the majority concluded, incorrectly, that Chandler's notes "inadvertently" fell into the hands of the NBI. The majority wrote, further: "When the United States agents made Spielman's information available to the Philippine authorities, they were not requesting any action whatsoever." *Stonehill II*, 405 F.2d at 746. But the primary focus in both courts was on whether Chandler was conveying Spielman's information or was conveying his own instructions. Nothing in either the full Picture Book or the Powers Memorandum suggests that Chandler was conveying his own information and instructions. Indeed, Chandler's statements to McCarthy and Huckabee in Rome suggest that he was conveying Spielman's information and instructions, as he testified at the suppression hearing.

b.    Hawley's Perjury

The documents uncovered by Taxpayers through their FOIA requests demonstrate that Hawley lied in his deposition about his knowledge of the raid. In his deposition, Hawley testified that no one told him that the raid would be postponed to March 3 from its originally scheduled date of February 24. He also testified that he was not informed in advance that the raid would be carried out on March 3, and that he found out

that the raid had been carried out only when he read about it in the paper the next morning. He concocted a story about how he was sure that he had not known about the rescheduling to March 3 because of a party he had hosted on March 4. The documents uncovered through FOIA show that Hawley sent a memorandum to Hoover on February 23 informing him that the raid had been postponed. He sent another memorandum to Hoover on March 2 informing him that the raid had been rescheduled for March 3.

**[9]** However, perjury by a witness does not necessarily constitute fraud on the court. *Levander*, 180 F.3d at 1119. Even under the facts revealed by the FOIA documents, Hawley's involvement in the raid was much less substantial than Chandler's. Hawley's role was largely that of an interested observer, relaying information to Washington. It was Chandler's much more active participation in the lead-up to the raid, and in the raid itself, that posed the largest problem for the government in defending against the motion to suppress. Hawley's lie concerning what he knew, and when he knew it, likely did not affect the outcome of the case.

### c.    Lukban and Nocon's CIA Connections

Taxpayers claim that Lukban and Nocon were working for the CIA, and that their activity in connection with the raid should therefore be considered the activity of U.S. agents. Taxpayers argue that the United States committed fraud on the court by intentionally concealing Lukban and Nocon's ties to the CIA.

There is evidence in the documents recently obtained by Taxpayers that Nocon worked with the CIA, especially in connection with wiretapping activities. However, there is little evidence that Lukban worked with the CIA. In attempting to show Nocon and Lukban's CIA ties, Taxpayers rely primarily on CIA redactions in the documents released through FOIA. In documents in which the CIA redacted names and informa-

tion for "national security" reasons, based on a stated desire to prevent "the identification of individual human sources," and not to "reveal[ ] a CIA intelligence relationship with a foreign intelligence service," it appears that Lukban and Nocon's names were redacted.

There is some direct evidence to suggest that Nocon worked on wiretapping with CIA agent Joseph McGee. The IRS Memorandum recounted McGee's involvement in training and aiding the NBI with wiretapping activities. McGee also told the IRS that his primary NBI contact, whose name is consistently redacted, was a specialist in telephone taps. McGee mentioned that this person may have been paid money by the CIA. Taxpayers point out that in his February interview in Rome, Chandler told McCarthy and Huckabee that Nocon had told him that he "was a wiretap expert." Taxpayers also point to Chandler's statement to McCarthy and Huckabee that Nocon

> seemed to be a very good friend of [redacted]. In fact, on a number of occasions when Nocon visited Chandler's house to play the tape recordings [of Stonehill from the NBI wiretaps], Nocon would comment that he had either just come from or was going to [redacted]'s house. This raised the question in Chandler's mind as to the extent that [redacted] may have been involved in advising or assisting Nocon in connection with wiretaps of Stonehill and Brooks. However, Chandler does not have any actual knowledge as to what extent, if any, [redacted] was involved in such wiretaps.

Taxpayers assert that the redacted name is McGee's. If this is true, it indicates that McGee was helping Nocon with the NBI wiretaps of Taxpayers.

[10] For two reasons, we conclude that there is not clear and convincing evidence Nocon and Lukban were CIA agents

such that their action should be attributed to the United States. First, Taxpayers' evidence is too conjectural to satisfy the clear and convincing standard. Second, even assuming the redactions are as Taxpayers contend, these documents at most prove that Nocon, and perhaps Lukban, had some relationship with the CIA regarding wiretap training. However, the fact that Lukban and Nocon at some point worked with the CIA does not make everything they did the action of the U.S. government for purposes of a suppression motion. None of the evidence Taxpayers highlight suggests that McGee or any other member of the CIA was directing Lukban and Nocon in their investigation and raid. In fact, there is evidence in the record indicating that McGee was not directly involved in the Stonehill wiretaps. The IRS Memorandum reported that McGee stated that he did not know when the wiretaps of Stonehill began, and that he was not involved in giving advice or assistance for such wiretapping.

### d. McCarthy's Discrediting of Nocon's 1970 Affidavit

As discussed above, Taxpayers submitted a 1970 affidavit from Damaso Nocon as part of their 1971 renewed motion to suppress. Nocon's affidavit suggested that the United States had been much more involved in the raid than any U.S. official had admitted. The district court found Nocon's affidavit and his later testimony not credible. *Stonehill III*, 420 F. Supp. at 52. Taxpayers contend that in his attempt to impeach Nocon, McCarthy made false statements to the district court.

First, Taxpayers argue that McCarthy misrepresented the facts when he sought to discredit Nocon's claim that his "principal function" with the NBI was "to maintain liaison with foreign governments and police agencies, including their local representatives." In the government's brief to the district court in response to Taxpayers' renewed motion to suppress in 1976, McCarthy represented that Nocon's assignments "did not include liaison with foreign governments and police agencies." McCarthy relied on Lukban's affidavit, in which Luk-

ban had written that Nocon "had no official duties or an official position which called for him to maintain liaison with foreign governments and police agencies."

Taxpayers argue that the documents they uncovered through FOIA demonstrate that Nocon's assignments did include liaison with foreign governments. A 1966 memorandum from the IRS representative in Manila (Chandler's successor) to OIO stated that Nocon was "well known to me and every U.S. law enforcement agency in the Philippines," and described him as "perhaps the best informed person in the Philippines as far as the Stonehill case and any other matters of interest to us are concerned." Further, a February 16, 1962, memorandum to the U.S. Embassy in Tokyo from someone named Stevenson, copying Chandler, had informed the Tokyo Embassy that it would soon be contacted by Nocon, and that the "[s]uccess of Nocon mission [is] extremely important to Treasury. Please extend all possible cooperation."

**[11]** Taxpayers exaggerate the breadth of McCarthy's statement. At issue on the renewed motion to suppress was Nocon's statement in his affidavit that his "principal function" was to liaise with foreign governments. It was in response to this claim that Lukban wrote that Nocon had "no official duties or an official position which called for him to maintain liaison with foreign governments and police agencies." It was obvious from Hawley and Chandler's testimony that they had significant interaction with Nocon. Lukban's statement in his affidavit, and McCarthy's repetition of that statement in the government's brief, were simply countering the argument that Nocon's principal function was to maintain liaisons with foreign governments. Taxpayers misrepresent the contents of the February 16 memorandum about the "Nocon mission," suggesting that it states that Nocon had been sent to Tokyo by the CIA. On the contrary, a memorandum from Hawley to Hoover, also sent on February 16, makes clear that Nocon was sent to Tokyo by Lukban. After the fire that destroyed the plant and warehouse of Philippine Tobacco, Brooks left for

Japan and his whereabouts were unknown. Hawley wrote, "Lukban believes must take early action and has dispatched Agent Damaso Nocon to Japan on . . . Brooks investigation and requests cooperation with Legat Tokyo." It is not surprising that the United States was willing to extend cooperation to the NBI, especially given that the IRS was already considering a tax case against Stonehill and Brooks based on Spielman's information. However, it is clear that Nocon was acting for Lukban, rather than the CIA.

Second, Taxpayers argue that McCarthy misrepresented Nocon's duties regarding wiretapping. Lukban wrote in his affidavit that "Mr. Nocon never made a telephone tap for the NBI as he says in his affidavit, although he may well have made some typewritten transcripts from records." In one of the government's briefs, McCarthy quoted Lukban's testimony that Nocon "never tapped — he typed." Taxpayers note that Chandler reported to McCarthy and Huckabee, during his interview in Rome, that he thought Nocon was a "wiretap expert." The IRS Memorandum presumes that "Nocon was tapping the wires of Stonehill and his associates and making the information available to Chandler, Hawley, et al." is also possible, inferring from certain redactions, that McGee said Nocon's "specialty was telephone tap[s]."

[12] The documents now available suggest that Lukban was lying when he said that Nocon had never made a telephone tap. However, even if this is so, none of McCarthy's representations in the government's brief constitutes fraud on the court. McCarthy was not compelled to believe Nocon and to disbelieve Lukban. Further, McCarthy never represented that Nocon had never placed a wiretap. Lukban's statement that "Nocon never made a telephone tap for the NBI" was not reproduced in the government's brief. Lukban's testimony that Nocon "never tapped — he typed" was included in the government's brief as part of a three-page block quote from Lukban's testimony and was never specifically singled out. This testimony was not used to rebut Taxpayers' argument

that Nocon at times made telephone taps, but rather to rebut Taxpayers' much more specific argument that Hawley instructed Nocon to conduct wiretaps of Stonehill in 1960. There is nothing to suggest that the government incorrectly accused Nocon of lying when he wrote that Hawley instructed him to make taps.

### e.   Access to Seized Documents

Taxpayers argue that McCarthy lied in describing the extent of American officials' access to the seized documents. In his 1967 affidavit in the district court, McCarthy stated that "this Government has never been able to examine all of the records in the possession of the Philippine Government and select those it wished to copy; rather this Government copied those records which the Philippine Government selected and chose to allow to be copied." McCarthy later represented to the court, "I believe there is some limitation on [Government access to seized documents]. Our people had to ask for specific documents. They did not just have free access to every room. They would say, 'We believe there are such and such records on such and such a company from what we have seen. Can you find that.' "

**[13]** McCarthy's statements were not inconsistent with the evidence. As we previously discussed, the FOIA memoranda that discuss the extent of U.S. access to documents are somewhat inconsistent. On the one hand, Hawley reported to Hoover that Lukban was providing copies of "all documents found," Powers reported "splendid cooperation" from the NBI in accessing documents, and Chandler later reported that, after he had helped the NBI acquire space for the documents, the documents were "fully available." On the other hand, Ragland's memorandum from October 1962 stated that the U.S. agents had "never actually had unlimited access to the records."

### f. Chandler's Participation on the Day of the Raid

**[14]** Taxpayers contend that in his 1967 brief in the district court McCarthy lied about Chandler's activities on the day of the raid. McCarthy wrote that after being called to Lukban's office on the night of the raid, and then following the hapless NBI agent to help sort documents, Chandler "followed this Agent from the warehouse to the [U.S. Tobacco] main office and there had given some advice to the NBI agent." Taxpayers note that McCarthy's suggestion that Chandler was merely following the agent is incorrect, as Chandler chose to go to the main office on his own initiative. However, to the extent that McCarthy may have been suggesting that Chandler was merely following the agent, he was more likely making a mistake rather than a willful misrepresentation. Chandler's clear testimony during the suppression hearing had been that he had gone to the U.S. Tobacco main office on his own initiative.

### g. Diokno-Seigenthaler Meeting

**[15]** Taxpayers contend that the FOIA documents concerning the Diokno-Seigenthaler meeting show that the United States responded to the meeting by assigning IRS Agent Powers to Manila. It is true that the memorandum assigning Sterling Powers to Manila was written on February 13, 1962, only two days after the Diokno-Seigenthaler meeting at which Diokno requested U.S. coordination, However, according to the February 12, 1962, foreign service memorandum concerning this meeting, Diokno requested from Seigenthaler only that he send two tobacco experts and that he coordinate U.S. raids in New York with his raids. Taxpayers do not contest the fact that neither of these requests was fulfilled. There is nothing to suggest that Diokno requested that more IRS agents be sent to Manila. Furthermore, Chandler had been requesting additional agents to work on Taxpayers' case for some time. The decision to send additional IRS agents to Manila was most likely a recognition that, in light of Spielman's information, the time had come to honor Chandler's

longstanding request for help on the Stonehill investigation. Further, as we discussed above, the foreign service memorandum describing the Diokno-Seigenthaler meeting was in any event summarized with all key details and submitted to the district court as part of the 1967 suppression hearing, thereby putting all of the basic facts about the meeting before that court.

### h.    Allegations as a Whole

**[16]** Taking into consideration all of Taxpayers' contentions, we conclude that the government did not commit fraud on the court.

First, in nearly all fraud-on-the-court cases, the misrepresentations went to the central issue in the case. For example, in *Levander* and *Pumphrey* we vacated for fraud on the court when the litigants intentionally misrepresented facts that were critical to the outcome of the case, showing the appropriate "deference to the deep rooted policy in favor of the repose of judgments." *Hazel-Atlas Glass Co.*, 322 U.S. at 244-45.

**[17]** In this case, the government's misrepresentations were relatively few and were largely tangential to the fundamental question of U.S. participation. Even the full Picture Book and Powers Memorandum do not significantly change the story as presented to the district court. The similarity between the summary in the internal IRS Memorandum of the evidence supporting suppression of the seized documents and the summary of such evidence in Judge Browning's 1968 dissent best demonstrates the nature of the new evidence Taxpayers have uncovered. The IRS wrote:

> It appears that the activities of United States officials in preparation and planning for the raids and on the day of the raids were significant. These include [redacted, presumably McGee]'s activities in connection with the wiretapping; the planning meetings

in Chandler's home; Chandler's assistance in drawing a sketch of locations to be raided; Chandler's action the night before the raid in requesting that a warrant be issued for the Army and Navy Club; the fact that on the night of the raid Chandler pointed out to the N.B.I. agent at the United States Tobacco Company warehouse the significance of the rolls of cigarette paper; and the fact that on the night of the raid Chandler pointed out to the N.B.I. agent at the United States Tobacco Company office the significance of the back room.

Judge Browning wrote:

[T]he American agents contributed to the unlawful enterprise in at least these respects: They brought Spielman and his information to the attention of the Philippine authorities, and, as the majority finds, "finally persuaded" Spielman to meet with them. Chandler made his home available to the NBI for meetings with Spielman, and for the "planning" and "preparation" of the raids. Chandler attended these meetings. In the course of "relaying information" from Spielman to the NBI, Chandler prepared a diagram and a memorandum of two of the premises to be raided. Chandler suggested an additional location to be raided; and his suggestion was adopted. Chandler, prior to the raids, "secured permission from Colonel Lukban to examine and copy records seized in the raids." After the raids had begun, Chandler and his two assistants, at Colonel Lukban's request, went to one of the premises being searched, and "pointed out" the "significant" books and records to be seized. From this search location the three American agents, on their own initiative, went to another. There Chandler inquired whether the NBI agents had found a records storage room which Spielman had mentioned, and upon discovering that they had not,

> Chandler pointed out the location of the storage room to the NBI agent in charge.

*Stonehill II*, 405 F.2d at 750-51 (Browning, J., dissenting) (footnotes omitted); *see also id.* at 750-51 nn. 15-20 (describing the evidence for these findings in more detail).

Judge Browning made a strong argument that this evidence should have been suppressed in 1967. The author of the IRS Memorandum appears to have agreed with Judge Browning. The district court and a majority in this court disagreed. The similarity of the government's internal analysis of the case and that of Judge Browning, and near-identity of the facts upon which the two analyses rely, fatally undermine any claim that the government committed fraud on the court.

### B.   *Throckmorton*

Taxpayers also argue that the judgment should be vacated because William Saunders, Taxpayers' business partner and at times their attorney, served as an informant against them for the government. This, they argue, violates *United States v. Throckmorton*, in which the Supreme Court held that a suit could be resurrected in a case where "an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side." 98 U.S. at 66. In such a case "there has never been a real contest in the trial or hearing of the case." *Id.* We have reaffirmed this principle, stating that in such a case a party is "fraudulently prevented from presenting his claim or defense." *Kimes v. Stone*, 84 F.3d 1121, 1127 n.3 (9th Cir. 1996) (internal quotation marks omitted).

Taxpayers rely on a series of memoranda they uncovered through FOIA. In a 1960 memorandum from IRS Agent James Griffin to the IRS Audit Division, Griffin noted that Saunders reported "in confidence" that Stonehill had for-

warded a check from a Swiss bank account to Honolulu. Griffin also provided instructions to prevent Saunders from being "compromised." In another memorandum, written shortly thereafter, Louis Blissard, the U.S. Attorney in Hawaii, wrote to Lukban with information from William Saunders, an attorney "who is in some business ventures with Stonehill." In July 19, 1967, Fred Ugast, Chief of the General Litigation Section of the DOJ Tax Division, wrote to Lester Uretz, IRS Chief Counsel, that "[i]t is anticipated that one of the key witnesses in [the Stonehill] case will be an attorney in Honolulu, Hawaii, named William W. Saunders." Ugast's memorandum then discusses a tape recording of an interview of Saunders made by "Special Agent Davis." It is unclear what subjects Saunders discussed in this interview, and whether Stonehill and the rest of his litigation team were aware of Saunders's proposed testimony.

Taxpayers also note that, based on the information Taxpayers obtained through FOIA, Stonehill sued Saunders in Hawaii state court for breach of the fiduciary duty of confidentiality and breach of the duty of undivided loyalty. Although the jury found that Saunders had breached these duties, it awarded no damages because it found no legal causation.

**[18]** Although it is clear that Saunders did cooperate with the government, we reject Taxpayers' *Throckmorton* claim. It is unclear the extent to which there was an overlap between the time in which Saunders was actively informing on Stonehill and Brooks and the time in which he served as their attorney. During some of the litigation of this case Saunders was on Taxpayers' team of attorneys. He was on the team for the tax lien foreclosures in Hawaii, and he was the attorney of record in Taxpayers' answer to the complaint in the original tax case. However, the memorandum describing Saunders's "in confidence" communication with the IRS, by far Taxpayers' best evidence of Saunders's cooperation with the government, was sent in 1960. Although in his complaint against

Saunders in Hawaii state court Stonehill claimed that he entered into an attorney-client relationship with Saunders in 1959, it seems more likely that at that time Saunders was just a business associate and was not serving as Taxpayers' attorney. A government memorandum from October 15, 1962, suggests that Saunders obtained power of attorney for Stonehill for the first time in June, 1962. The memorandum states, "To our knowledge this association was not an attorney-client relationship [during the business ventures]; therefore, Saunders can be considered a third party with regard thereto." At best, the record is unclear concerning whether Saunders and Stonehill were in an attorney-client relationship when Saunders informed on Stonehill. That is, to the extent Saunders did inform on Taxpayers, there is insufficient evidence to show that anything Saunders did prevented Taxpayers from receiving "a real contest in the trial or hearing of the case." *Throckmorton*, 98 U.S. at 66. We therefore reject Taxpayers' *Throckmorton* claim.

## Conclusion

Any misrepresentations or false statements made by government witnesses or attorneys were on largely tangential issues and did not substantially undermine the judicial process by preventing the district court or this court from analyzing the case. We therefore reject Taxpayers' fraud-on-the-court claim. Because Taxpayers have not shown that Saunders provided information to the government before he was in an attorney-client relationship with Taxpayers, they have not established that Saunders prevented them from having a fair trial or hearing in their case.

**AFFIRMED.**